FILED
U.S. District Court
District of Kansas

APR 2 0 2023

Clerk, U.S. District Court
By _____ Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| Eric S. Clark, | } | |
|     Plaintiff | } | |
|          v. | } | Case No:  **2:23-cv-02170-JAR-RES** |
| Merrick Garland | } | |
| in official capacity as U.S. Attorney General, | } | |
| Merrick Garland | } | |
| in personal capacity, | } | |
| Unknown government agent #1 (UGA#1) | } | |
| in personal capacity, | } | |
| Unknown government agent #2 (UGA#2) | } | |
| in personal capacity, | } | |
| Unknown government agent #3 (UGA#3) | } | |
| in personal capacity, | } | |
| Unknown government agent #4 (UGA#4) | } | |
| in personal capacity, | } | |
| Unknown government agent #5 (UGA#5) | } | |
| in personal capacity, | } | |
| Unknown government agent #6 (UGA#6) | } | |
| in personal capacity, | } | |
|     Defendants | } | |

## COMPLAINT

(verified complaint – See Exhibit A)

### *INTRODUCTION*

Plaintiff, Eric S. Clark (hereafter "CLARK") appears before this Court to

file this COMPLAINT,  requesting legal and equitable relief for unconstitutional

conduct committed by unknown government agents and the Attorney General of

the United States (hereafter collectively referred to as "Defendants").

CLARK has attempted, on multiple occasions, to purchase a firearm from a

1

Federal Firearms Licensee ("FFL") that was in interstate commerce by virtue of the FFL acquiring the firearm from an out of state supplier. The firearms sought for these attempted purchases included handguns, to use for lawful purposes including the purpose of self defense at his home and in public. CLARK was prevented from making those purchases in a timely manner solely because of Defendants' enforcement of the statutes found at 18 U.S.C. §922(t) which is an infringement on CLARK's fundamental right to keep and bears arms which is protected by the Second and Fourteenth Amendments of the Federal Constitution and; is a violation of CLARK's right to Due Process which is protected by the Fifth and the Fourteenth Amendments of the Federal Constitution.

CLARK has also, on multiple occasions, attempted to transfer a firearm through an FFL which had been purchased from an out of state private party (i.e., other law-abiding responsible citizen residing in another State) and shipped to the FFL including handguns and  long guns (including shotguns and semi-automatic rifles) but was prevented from completing those transfers in a timely manner because of Defendants' enforcement of the statutes found at 18 U.S.C. §922(t) which is an infringement on CLARK's right to keep and bear arms which is protected by the Second Amendment and the Fourteenth Amendment of the Federal Constitution and a violation of CLARK's right to Due Process which is protected by the Fifth and Fourteenth Amendments of the Federal Constitution.

Also presently, CLARK intends to purchase, transfer, and possess and use firearms and ammunition ( i.e., keep and bear arms)  which have traveled in

interstate commence in the future including a handgun and appropriate associated ammunition for the purpose of self defense in his home and his right to do so which is protected by the Second Amendment of the Federal Constitution *is likely to be infringed* by delays in purchasing firearms from an FFL and by transferring firearms through an FFL which are purchased from other out of state private parties who are law-abiding responsible citizens of other States.

CLARK, because of residual pain from severe injuries sustained from a fall from a ladder while trimming a tree with a chainsaw on May 16, 2022 also presently intends to become a user of marijuana for potential pain relief in the future including in a State where such use is lawful but is unlawful under Federal law. The State legislature of CLARK's current State of residence has held hearings and committee meetings in review of draft legislature to legalize medical use of marijuana, recognizing that marijuana does have medical benefits despite the contrary claim of federal law that marijuana "has no currently accepted medical use in treatment in the United States." 21 U.S.C. §812(b)(1) (See Schedule I at (c)(10) "Marihuana"). That federal classification effectively results in punishment for marijuana being more harsh than any Schedule II substances such as Fentanyl (See Schedule II at (b)(6)).

### BASIS FOR RELIEF SOUGHT

This is a civil action seeking legal and equitable relief for infringement of CLARK's constitutionally protected fundamental right to keep and bear arms for which Defendants actions have caused and likely will continue to cause.

CLARK's claims for relief may be, and are, brought under:

**(1)** the Declaratory Judgment Act at 28 U.S.C. §§ 2201 for declaratory relief and;

**(2)** 42 U.S.C. §1983 for injunctive relief and equitable relief and;

**(3)** private right of action for injunctive relief and equitable relief.

More specifically:

Under the Declaratory Judgment Act at 28 U.S.C. §§ 2201,

*for declaratory relief*, CLARK seeks a declaration of rights. ( See at § 2201, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.")

Under 42 U.S.C. §1983, *for injunctive relief and equitable relief*, CLARK seeks an injunction against the deprivation of rights [which includes the right of due process], privileges, and immunities secured by the Constitution and laws and such further equitable relief the court deems appropriate. The relief sought is not in conflict with, nor does the relief sought fall within, the express exception under 42 U.S.C. §1983 that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable).

Under 42 U.S.C. §1983, *for nominal damages* for past deprivation of CLARK's right to keep and bear arms.

Under private right of action, *for compensatory damages, injunctive relief*

*and equitable relief*, CLARK seeks compensatory damages, an injunction against the deprivation of his rights protected under the Second Amendment to the federal Constitution and seeks such further equitable relief the court deems appropriate. This private right of action is inherent in the federal constitution for the protection of the beneficiaries of the that constitution. See, e.g., *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971) noting that "where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." See *Bell v. Hood*, 327 U.S. 678, 684 (1946).

> "'Disposition of private rights to life, liberty, and property" was understood to "fal[l] within the *core of the judicial power*, whereas disposition of public rights [was] not." Wellness Int'l Network, Ltd. v. Sharif, 575 U. S. 665, 711 (2015) (THOMAS, J., dissenting).' *Axon Enterprise v. Federal Trade Commission, et al.*, 598 U. S. ____ (2023) (Thomas J., concurring) (emphasis added)

> "[W]hen private rights are at stake, full Article III adjudication is likely required. Private rights encompass "the three 'absolute' rights," life, liberty, and property, "so called because they 'appertain and belong to particular men merely as individuals,' not 'to them as members of society or standing in various relations to each other'— that is, not dependent upon the will of the government." *Wellness Int'l Network*, 575 U. S., at 713–714 (dissenting opinion) (quoting 1 W. Blackstone, Commentaries on the Laws of England 119 (1765); alterations omitted)." *Ibid.*

*Marbury* "'stand[s] for the importance of private right." *Harrison*, 86 Geo. L. J., at 2516, n. 10.' *Id.* at footnote 2

None of the named defendants are "judicial officers" as mentioned in

42 U.S.C. §1983 and; the enforcement actions by the named defendants caused

infringement and deprivation of a constitutional right of CLARK and the

enforcement actions of named defendants were conducted under color of law.

Future enforcement actions by one or more of the named defendants *are likely*

*to cause* infringement and deprivation of a constitutional right of CLARK and

those enforcement actions *would be* conducted under color of law. Further,

CLARK has been chilled from attempting future purchases of firearms at some

FFLs who charge a fee for any NICS check that results in providing an

acknowledgement of "Denied" to the FFL.

The facts alleged herein describe past enforcements which not only violated

CLARK's right to keep and bear arms in the past but also had some chilling effect

on his exercise of his constitutional right to keep and bear arms in that CLARK

now attempts purchases of lawful firearms less frequently than CLARK otherwise

would because of the near certainty of the exercise of that right being futile and,

thus, futile use of his time until the enforcement actions are enjoined pertaining to

18 U.S.C. §922(t). The facts alleged demonstrate a likelihood of future

enforcement that will violate CLARK's constitutionally protected right.

*SPECIFIC RELIEF SOUGHT*

CLARK seeks a declaration that the entirety of 18 USC § 922 is

unconstitutional facially because 18 USC § 922 is an unconstitutional exercise of

congressional power as it exceeds the scope of the power provided under both,

the Taxing Power the powers available pursuant to the Commerce Clause. See

section heading of "ANTI-POWER" in this COMPLAINT.

CLARK seeks a declaration that 18 U.S.C. §922(t), as-applied to CLARK by past actions of the defendants, was unconstitutional in that it violated CLARK's right to keep and bear arms (retrospective harm) and; CLARK seeks a declaration that 18 USC § 922(t) is unconstitutional facially because 1) 18 USC § 922(t) is not consistent with the text, history and tradition of the Second Amendment and; 2) 18 USC § 922(t) is an unconstitutional exercise of congressional power as it exceeds the scope of the power provided under both, the Taxing Power the powers available pursuant to the Commerce Clause.

CLARK also seeks permanent injunctive relief, i.e., the enjoining of all agents and officials of the federal government from taking any future actions to enforce18 U.S.C. §922(t) against anyone including CLARK because it is imminent that CLARK's right as protected by the Second Amendment will be infringed in the future (prospective harm) by enforcement actions performed by defendants or others authorized to enforce 18 U.S.C. §922 (t) directly or indirectly.

CLARK also seeks a declaration that the use of the revised Form 4473 for implementing 18 USC § 922(t) is not constitutionally permissible because it exceeds the statutory authority for implementing NICS background checks by implicitly requiring answers to incriminatory questions in order to exercise the enumerated fundamental right to keep and bear arms protected by the Second Amendment.

CLARK seeks a declaration that 18 USC § 922(g)(3) is facially

7

unconstitutional because it is not consistent with the text, history and tradition of

the Second Amendment and; seeks injunctive relief, i.e., the enjoining of all agents

and officials of the federal government from taking any future actions to enforce

18 U.S.C. §922(g)(3) against anyone including CLARK.

CLARK seeks a declaration that 18 USC § 922(k) is facially

unconstitutional because it is not consistent with the text, history and tradition of

the Second Amendment and; seeks injunctive relief, i.e., the enjoining of all agents

and officials of the federal government from taking any future actions to enforce

18 U.S.C. §922(k) against anyone including CLARK.

## JURISDICTION AND VENUE

28 U.S.C. § 1331  provides that "[t]he district courts shall have

original jurisdiction of all civil actions arising under the Constitution, laws,

or treaties of the United States."  This action arises under the Constitution of the

United States; therefore, this court has jurisdiction under the Constitution of the

United States, Article III, section 2 and under 28 U.S.C. §1331 (federal question)

as the claim in this case arises pursuant to the Second Amendment of the Federal

Constitution presenting a federal question concerning a federally protected right.

Venue is proper under 28 U.S.C. §1391(e)(1)(B) and (C), as a substantial

part of the actions and/or omissions giving rise to the claims occurred in, and

CLARK resides in, this judicial district, the District of Kansas.

## THE PARTIES

CLARK is a natural person and citizen of Kansas and of the United States,

residing in Williamsburg, Franklin County, Kansas.

Defendant Merrick Garland is being sued in his personal capacity and in his official capacity as the Attorney General of the United States with authority over the Department of Justice which includes agencies including the Federal Bureau of Investigations ("FBI") and Bureau of Alcohol, Tobacco, Firearm and Explosives ("BATFE"). Unknown government agents are sued in their personal capacity and they are subordinates of the Attorney General defendant.

Defendant Attorney General Garland and each of the unknown government agents are "persons" for purposes of 42 U.S.C. § 1983.

## FACTUAL ALLEGATIONS

CLARK hereby alleges and incorporates by reference all of the factual allegations contained this complaint for each and every count or claim made in this complaint.

1. Defendant Attorney General Merrick Garland issued, or continued to keep in effect, policies which required the other defendants to take actions which resulted in delays and denials of CLARK being able to purchase a firearm.

2. The Attorney General is responsible for executing and administering laws of the United States, and has enforced, and is presently enforcing, through his policies, directives, and subordinate agents, the statutes complained of in this action, specifically, 18 U.S.C. §922 (t).

3. Defendants unknown government agent #1-6 are all relevant employees

and officers of the United States for which the names and addresses of residence are currently unknown and they are all subordinates of the Attorney General defendant.

4. Defendant Attorney General was at all times relevant to this Complaint responsible for subordinate employees, including all of the unknown government agents named as defendants.

5. The Attorney General is charged under the law with the duty of hiring, supervising, training, disciplining, and establishing policy such that the conduct of all subordinate employees will conform to the Constitution of the United States of America.

6. At all times relevant to this cause, the unknown government agents acted in conformance with policies, practices, usage, and/or customs pertaining to, among other things, investigations and providing acknowledgements through the National Instant Criminal Background Check System (NICS) to inquiry inputs from Federal Firearm Licensees (FFLs).

7. At all times relevant to this cause, all defendants were acting within the course and scope of their employment and under color of law.

8. CLARK is, and has been, a resident of the State of Kansas for all times pertinent to the claims presented herein.

9. CLARK is over the age of 21 years old, and was over the age of 21 years old for all times pertinent to the claims presented herein.

10. CLARK is not, and has not been, under indictment for all times pertinent to the claims presented herein.

11. CLARK is not, and has not been, a fugitive from justice for all times pertinent to the claims presented herein.

12. CLARK is not, and has not been, an unlawful user of or addicted to any controlled substance for all times pertinent to the claims presented herein.

13. CLARK does not possess and has not possessed a state issued ATF-qualified alternate permit (i.e., a substitute for a NICS background check) for all times pertinent to the claims presented herein.

14. CLARK would be required to pay $132.50, pursuant to K.S.A. 75-7c05(b)(2)  as a nonrefundable license fee in order for CLARK to obtain a license under the Personal and family protection act and there is no exception for indigent persons under that act.

15. CLARK is not, and has not been, a "prohibited person", as that term applies to the statutes at issue, for all times pertinent to the claims presented herein.

16. CLARK intends to engage in future purchases of handguns and appropriate associated ammunition from out of state private parties for use at his home for the purpose of self defense after the date of the filing of this complaint and beyond the final disposition of this case.

17. CLARK, because of residual pain from severe injuries sustained from a fall from a ladder while trimming a tree with a chainsaw on May 16, 2022 also presently intends to use marijuana for potential pain relief in the future including in a State where such use is lawful but is unlawful under Federal law. CLARK would have done so already but for

the potential enforcement of 18 USC § 922(g)(3) against CLARK.

See also Exhibit B.

18. CLARK sought to purchase a firearm at an FFL on 06/15/2021

(See Exhibit C) and was denied because of the NICS background check

as implemented in federal law at 18 U.S.C. §922 (t)(1)(A&B) and; on the

Form 4473 used in connection with that attempted purchase, under the

heading of  "The response initially provided by NICS or the appropriate

State agency was:", the FFL checked the checkbox labeled "Denied"

after receiving an acknowledgement from the NICS system. The FFL

then refused to sell any firearm to CLARK because of that information.

19. On 6/15/2021, Defendant UGA#1 used the NICS system to provide

"denied" status information for the NICS background check being

requested by the FFL in order to determine if the FFL was permitted by

law to allow CLARK to purchase a firearm.

20. CLARK sent a letter dated June 16, 2021 to the FBI appealing that

"Denied" determination from the NICS system as then reflected on the

Form 4473by the FFL.

21. CLARK received a letter from the FBI dated August 27, 2021 in

response to that appeal (See Exhibit D) which contained in part:

> "we have been able to determine you are eligible to possess
> or receive a firearm. Your Kansas record has been updated.
> The FBI's Criminal Justice Information Services (CJIS)
> Division Firearm-Related Challenge Certificate is enclosed.

You must take this original certificate to the Federal
Firearms Licensee (FFL) who initiated your background
check through the National Instant Criminal Background
Check System (NICS) to complete your transaction. If more
than 30 days have elapsed since the initial background
check, the FFL must recheck the NICS before allowing the
firearm transfer."

And the certificate referenced in that letter contained in part,

"Mr. Clark is eligible to possess or receive a firearm" and

"INITIATION DATE: 2021-06-15".

22. CLARK then sought to purchase the same firearm at the same FFL on

09/15/2021 as he had on 06/15/2021 and was that purchase was

delayed (See Exhibit E) because of the NICS background check as

implemented in federal law at 18 U.S.C. §922 (t)(1)(A&B) and; on the

Form 4473 used in connection with that attempted purchase, under the

heading of "The response initially provided by NICS or the appropriate

State agency was:", the FFL checked the checkbox labeled "Delayed"

after receiving an acknowledgement from the NICS system. The FFL

then refused to sell any firearm to CLARK because of that information

but the FFL also indicated that CLARK could purchase the firearm on

or after 09/21/2021 (which was also reflected on the Form 4473 by the

FFL).

23. On 9/21/2021, Defendant UGA#2 used the NICS system to provide

"delayed" status information for the NICS background check being

requested by the FFL in order to determine if the FFL was permitted by law to allow CLARK to purchase a firearm.

24. On an earlier occasion, CLARK sought to purchase the a firearm on 08/16/2018 (See Exhibit F) and was that purchase was delayed because of the NICS background check as implemented in federal law at 18 U.S.C. §922 (t)(1)(A&B) and; on the Form 4473 used in connection with that attempted purchase, under the heading of "The response initially provided by NICS or the appropriate State agency was:", the FFL checked the checkbox labeled "Delayed" after receiving an acknowledgement from the NICS system. The FFL then refused to sell any firearm to CLARK because of that information but the FFL also indicated that CLARK could purchase the firearm on or after 08/22/2018 (which was also reflected on the Form 4473 by the FFL). But then, the "Delayed" was changed to "Denied" on 08/21/2018 and CLARK was informed of the new denial status by the FFL. Then, presumably, the status was changed again to "Proceed" at an unknown time – "presumed" because after inquiry concerning the denial on 08/22/2018 regarding NTN 100PN8CT4, CLARK received a response from the FBI dated 08/24/2018 (See Exhibit G) indicating they had no information concerning the transaction and also stated:

> "Please be advised, the NICS is required to destroy all proceeded transactions within 24 hours of providing the final status to the Federal Firearms Licensee. Likewise,

14

the NICS is required to destroy delayed transactions
within 88 days from the date the transaction was
initiated. It is possible your transaction fits in one of
these two categories."

As there was no information available and it had not yet been 88 days,
it is reasonable to presume that the status was changed to "Proceed".
After this, on 09/20/2018, (See Exhibit H) CLARK again sought to
purchase the same firearm as was attempted on 08/16/2018 and that
purchase was delayed because of the NICS background check as
implemented in federal law at 18 U.S.C. §922 (t)(1)(A&B) and; on the
Form 4473 used in connection with that attempted purchase, under the
heading of "The response initially provided by NICS or the appropriate
State agency was:", the FFL checked the checkbox labeled "Delayed"
after receiving an acknowledgement from the NICS system. The FFL
then refused to sell any firearm to CLARK but the FFL also indicated
that CLARK could purchase the firearm on or after 09/26/2018 (which
was also reflected on the Form 4473 by the FFL).

25. On 08/16/2018, Defendant UGA#3 used the NICS system to provide a
"delayed" status for the NICS background check being requested by the
FFL in order to determine if the FFL was permitted by law to allow
CLARK to purchase a firearm.

26. On 08/21/2018, Defendant UGA#4 used the NICS system to provide a
"denied" status for the NICS background check previously requested by
the FFL on 08/16/2019.

15

27. Sometime between 08/21/2018 and 8/24/2018, Defendant UGA#5 used the NICS system to provide a "proceed" status for the NICS background check which had been previously requested by the FFL on 08/16/2018.

28. On 09/20/2018, Defendant UGA#6 used the NICS system to provide a "delayed" status for the NICS background check being requested by the FFL in order to determine if the FFL was permitted by law to allow CLARK to purchase a firearm.

29. CLARK has previously been denied several times and delayed numerous times from being able to purchase and transfer firearms at various FFLs, including other delays of over 180 days, because of the NICS background check as implemented in federal law at 18 U.S.C. §922 (t)(1)(A&B) including on 07/17/2019, 01/26/2023, and 3/8/2023, 4/5/2023, each time Delayed. This is not an all inclusive list but exemplary of the situation CLARK faces in relation to burden on his right to keep and bear arms because of the operation of the NICS background check system and requirements in federal law to apply that actions to CLARK's attempts to purchase or transfer a firearm.

30. CLARK is frequently delayed or denied under the NICS system even though he has received multiple letters from the FBI reversing "Denied" determinations which specifically state that CLARK is eligible to purchase a firearm. One such letter was dated August 29, 2016 from NICS Section, CJIS Division which contains in part :

> "We have been able to determine <u>you are eligible to possess or receive a firearm</u>. The FBI Criminal Justice Information Services (CJIS) Division's NICS Section Firearm Appeal Certificate is enclosed." (underline in original)

And the Certificate referenced in that letter contained in part,

"Mr. Clark is eligible to possess and receive a firearm" and

"INITIATION DATE: February 8, 2016"

31. The FFLs at whose locations CLARK has been subjected to NICS background checks were open to the public at all times pertinent to the claims herein.

32. In January or February of 2023, CLARK sought to acquire a firearm (long gun - shotgun) for use of lawful self defense from an FFL but terminated that purchase attempt when informed that a deposit was required before the NICS check (as required by 18 U.S.C. §922(t)) would be performed and informed that if the FFL received a "Denied" acknowledgement response from NICS then CLARK would be required to pay a processing fee of $50.00.

33. CLARK would attempt to exercise CLARK's right to purchase lawful firearms more frequently but for the near certainty of that exercise being futile because of the enforcement of 18 U.S.C. §922(t).

34. CLARK intends to become a user of marijuana for potential pain relief in the near future including use of the substance in a State where such use is lawful but that use is unlawful under Federal law.

35. CLARK has intent to engage in conduct of restoring a rusty firearm that

can be purchased outside of CLARK's State of residence that will require

CLARK to remove or alter or obliterate the rusty firearm's

manufacturer's serial number in order to safely use the firearm for the

purpose of self defense in his home.

36.    **DISCUSSION OF SOME APPLICABLE LAW**

*RIGHT TO BRING SUIT*

See *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004):

> "The Eleventh Amendment confirms the sovereign status of the
> States by shielding them from suits by individuals absent their
> consent. *Seminole Tribe of Fla.* v. *Florida*,517.U.S. 44, 54 (1996).
> To ensure the enforcement of federal law, however, the Eleventh
> Amendment permits suits for prospective injunctive relief against
> state officials acting in violation of federal law. *Ex parte Young,*
> *supra.* This standard allows courts to order prospective relief see
> *Edelman* v. *Jordan*, 415 U.S. 651 (1974); *Milliken* v. *Bradley*, 433
> U.S. 267 (1977), as well as measures ancillary to appropriate
> prospective relief, *Green* v. *Mansour*, 474 U.S. 64, 71–73 (1985)."

See also *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989)("Of

course a state official in his or her official capacity, when sued for injunctive

relief, would be a person under § 1983 because 'official capacity actions for

prospective relief are not treated as actions against the State.'").

See also *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 269 (1997)

(recognizing exception to Eleventh Amendment immunity for certain suits

seeking declaratory and injunctive relief against state officers in their individual capacities).

## STANDING

CLARK has not only been subjected to the statutes' restrictions in the past which presents an injury in fact which provides basis for declaratory relief, but CLARK has also pled intention to engage in future conduct regulated by the challenged statutes and, thus, would be subjected to application of the restrictions on keeping and bearing arms set forth in the challenged statutes in the future which presents basis for injunctive relief.

## THE RIGHT WAS OPERATIVE DURING NICS BACKGROUND CHECKS

Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *New York State Rifle & Pistol Association v. Bruen*, 142 S.Ct. 2111 (2022). "The Second Amendment's plain text thus presumptively guarantees petitioners" *Id.*, like CLARK, 'a right to "bear" arms in public for self-defense.' *Id.* Further, *District of Columbia v. Heller*, 554 U.S. 570,584 (2008) confirmed that the right to "bear arms" includes "being armed and ready for offensive or defensive action in a case of conflict with another person." and encompasses an "individual right to possess and carry weapons in case of confrontation," *Id.* at 592. "and confrontation can surely take place outside the home." *New York State Rifle & Pistol Association v. Bruen*, 142 S.Ct. 2111 (2022) Thus, while CLARK was located in an FFL locations that are open to the public, the right was operative even during attempts to purchase or transfer firearms using the services of those FFLs and delay caused by running a NICS

background check delayed CLARK's exercise of his individual right to
keep and bear arms.

### THE NICS FIREARM REGULATION

The statutory requirement in federal law to use the National Instant Criminal
Background Check System (NICS) which was established through enactment of
the Brady Handgun Violence Prevention Act of 1993. The provisions at found at
18 U.S.C. §922(t) require that Federal Firearm Licensees (FFLs) (such as gun shop
owners, pawn shop dealers, and retailers) must use (under stiff potential civil
penalties for non-use) the National Instant Criminal Background Check System
(NICS) or, in some states require presentation of a state issued ATF-qualified
alternate permit (i.e., a substitute for a NICS background check) or contact the
State to initiate and complete a background check similar to NICS.

Whether a NICS background check or a State background check or an
alternate state-issued permit is required is determined by the State of residence and
whether the purchase is for a handgun or a long gun.  See participation map at
https://www.fbi.gov/file-repository/nics-participation-map.pdf  In Kansas,
concealed handgun licenses issued on or after July 1, 2010 qualify as alternatives
to the NICS background check. See the chart at www.atf.gov/rules-and-
regulations/permanent-brady-permit-chart   CLARK, who resides in Kansas, does
not possess a qualified alternative to the NICS background check and, thus,
CLARK purchases of firearms (which constitute "transfers"), are not allowed by
law unless subjected to a NICS background check.

18 U.S.C. §922(t)(1)(A&B)  provides, in pertinent part, that an FFL

> "shall not transfer a firearm to any other person who is not
> licensed under this chapter, unless—

(A) before the completion of the transfer, the licensee contacts the national instant criminal background check system established under section 103 of that Act;

(B)
(i) the system provides the licensee with a unique identification number; or

(ii) subject to subparagraph (C), 3 business days (meaning a day on which State offices are open) have elapsed since the licensee contacted the system, and the system has not notified the licensee that the receipt of a firearm by such other person would violate subsection (g) or (n) of this section, or State, local, or Tribal law;"

Note: "subject to subparagraph (C)" concerns only purchasers under the age of 21 and CLARK is not under the age of 21.

In general, when using NICS, the FFL may allow a purchase (i.e., transfer of a firearm to the citizen) under different results of the NICS check, specifically, if:

1) NICS provides an acknowledgement that the sale may "proceed" which is indicated when "the system provides the licensee with a unique identification number" or;

2) NICS provides an acknowledgement of "delay" (i.e., does not provide the licensee with a unique identification number) and three (3) business days (meaning days on which State offices are open) have elapsed but, then, only for a limited period of time (30 days) or;

3) NICS provides an acknowledgement of "denied" and the citizen appeals the denial and the citizen is successful in reversing the "denial" decision and provides proof of that reversal to the FFL. Except that a new background

21

check must also be performed before allowing the purchase if the prior background check was more than 30 days prior to the citizen's presentment of proof of the denial reversal.

### THE NICS FIREARM REGULATION APPLIES TO INDIVIDUAL CITIZENS

It may be argued that the NICS background check is a restriction placed upon individuals by an the FFL private actor and not the government but that is belied by the coercive hand of the government's involvement in the restriction being a provision of law. Not only does mere enactment of law demonstrate involvement, but 18 U.S.C. §922 (t)(5) underscores that involvement by providing, in pertinent part, that "[i]f the licensee knowingly transfers a firearm to such other person and knowingly fails to comply with paragraph (1) of this subsection with respect to the transfer" [...] "the Attorney General may, after notice and opportunity for a hearing, suspend for not more than 6 months or revoke any license issued to the licensee under section 923, and may impose on the licensee a civil fine of not more than $5,000."

The provisions of law enacted by Congress are, on their face, directed toward ensuring that, at a minimum, all individual citizens seeking to purchase a firearm from an FFL are subjected to a background check and could, depending on a given State's implementation, also be subject to passing firearm training courses, etc., in order for the statutory requirement to be met. Thus, while the burden of a background check is foisted upon the individual citizen directly by the FFL, that is no different than the government itself burdening the individual citizen as recognized by the well established constitutional maxim that the government cannot do indirectly what it is not permitted to do directly ("*Quando aliquid*

*prohibetur ex directo, prohibetur et per obliquum*") . To be certain, the civil penalty provision need not even exist to determine that enactment of the provisions in subsections 922(t)(1)(A&B) is an indirect action of Congress which places restrictions on the keeping and bearing of firearms by all law-abiding responsible citizens when making a purchase of a firearm through an FFL. The mere enactment of those requirements into federal law carries the inherent coercion associated with the public reputation of an FFL if the FFL was to be found operating in violation of federal law. Even without specific explicit civil penalties, the implementation of those provisions operates on all law-abiding responsible citizens the same as it operates upon law-breaking citizens. This type of indirect restriction on keeping and bearing arms would be little different than if, hypothetically, Congress enacted an indirect restriction on speech, such as a provision in Section 230 of the Telecommunications Decency Act ("230 Act") which required (i.e., by federal law) that certain private businesses (i.e., speech platform providers taking advantage of the Act's immunity protections) take steps to delete, remove or suppress (i.e., censor) any content on their platforms which express negative viewpoints about a certain subject matter. Would such a provision of law be considered to be only a business regulation rather than also being an indirect act of Congress which restricts the content of protected speech of individual law-abiding responsible citizens? Such incidental burdens (censorship) on speech (coerced by provisions of law) would be subject to First Amendment constitutional review even though it is an indirect means employed to reach the speech used by the people (individual citizens including all individual law-abiding responsible citizens). Likewise, though not hypothetical, the requirements of law

on FFLs which require NICS background checks on individuals must be subject to Second Amendment constitutional review. No other enumerated fundamental right requires a background check in order to exercise the right. Is the problem of using speech to incite riots just a different public policy balance or is that in recognition that the First Amendment takes some policy consideration off the table? Or is it that the current political climate favors firearm restrictions over speech restrictions?

Of note, with sufficient coercion by the government whether through direct or indirect means, a business can become a "state actor" for purposes of liability. It is currently unknown by CLARK whether there are immunity provisions for FFLs concerning private interference (tort) with the liberty rights of another, but if there were such provision, such as that seen the "230 Act", that would indicate that Congress understood that such law might subject the FFLs to liability as state actors for the violations of an individual's constitutional rights.

### CONSTITUTIONAL ANALYSIS

To start, congressional enactments are, of course, presumed constitutional but in certain areas the presumption has less force. *Cf. United States v. Carolene Products Co.*, 304 U.S. 144, 152-53 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938) ("There may be a narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten Amendments. . . "). However, as seen in *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822)  and the well established First Amendment prohibition against viewpoint discrimination, there are absolute limits which the government may not go beyond either directly

24

or indirectly. Indirect actions are neither beyond judicial review, nor outside of judicial responsibility to perform such review. "Constitutional provisions for the security of person and property are to be liberally construed, and "it is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." *Boyd v. United States*, 116 U.S. 616, 635, 6 S.C.t. 524, 535 (29 L. Ed. 746); *Gouled v. United States*, 255 U.S. page 304, 41 S.C.t. 261, supra." *Byars v. United States*, 273 U.S. 28,32 (1927). Some courts have indicated that the courts are not free to delve into legislative intent but that cannot be an absolute prohibition else the courts could not guard against exercises of power which operate indirectly to accomplish something that the government is prohibited from doing directly in violation of the well established constitutional maxim that the government cannot do indirectly what it is not permitted to do directly ("*Quando aliquid prohibetur ex directo, prohibetur et per obliquum*") . Thus, the powers exercised by Congress are constrained by such a constitutional check and it is the courts duty to apply that check appropriately. The court in *Bruen* laid out some interpretation guides including:

> 'courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond v. Robinson*, 9 F. 4th 217, 226 (CA3 2021).'

and:

> 'The Territory of New Mexico made it a crime in 1860 to carry "any class of pistols whatever" "concealed or otherwise." 1860 Terr. of N. M. Laws §§1–2, p. 94. This extreme restriction is an outlier statute

enacted by a territorial government nearly 70 years after the ratification of the Bill of Rights, and its constitutionality was never tested in court. Its value in discerning the original meaning of the Second Amendment is insubstantial.' *Id.* at footnote 22

and:

'We have already explained that we will not stake our interpretation of the Second Amendment upon a law in effect in a single State, or a single city, "that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms" in public for self-defense. Heller, 554 U. S., at 632; see supra, at 57–58. Similarly, we will not stake our interpretation on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also "contradic[t] the overwhelming weight" of other, more contemporaneous historical evidence. Heller, 554 U. S., at 632.' *Id.*

and:

'Those state courts that upheld broader prohibitions without qualification generally operated under a fundamental misunderstanding of the right to bear arms, as expressed in Heller. For example, the Kansas Supreme Court upheld a complete ban on public carry enacted by the city of Salina in 1901 based on the rationale that the Second Amendment protects only "the right to bear arms as a member of the state militia, or some other military organization provided for by law." *Salina v. Blaksley*, 72 Kan. 230, 232, 83 P. 619, 620 (1905). That was clearly erroneous. See Heller, 554 U. S., at 592. Absent any evidence explaining why these unprecedented prohibitions on all public carry were understood to comport with the Second Amendment, we fail to see how they inform "the origins and continuing significance of the Amendment." *Id.*, at 614; see also The Federalist No. 37, at 229 (explaining that the meaning of ambiguous constitutional provisions can be "liquidated and ascertained by a series of particular discussions and adjudications" (emphasis added)). Finally, these territorial restrictions deserve little weight because they were—consistent with the transitory nature of territorial

26

government—short lived. Some were held unconstitutional shortly after passage. See *In re Brickey*, 8 Idaho 597, 70 P. 609 (1902). Others did not survive a Territory's admission to the Union as a State. See Wyo. Rev.Stat., ch. 3, §5051 (1899) (1890 law enacted upon statehood prohibiting public carry only when combined with "intent, or avowed purpose, of injuring [one's] fellow-man"). Thus, they appear more as passing regulatory efforts by not-yet mature jurisdictions on the way to statehood, rather than part of an enduring American tradition of state regulation.'

## *LACK OF CONSTITUTIONAL BASIS*

18 USC § 922(t) is unconstitutional by exceeding congressional authority under both the Taxing Power and the Commerce Clause (presuming those are other bases of authority for the enactment of the provisions) and; 18 USC § 922(t) is also not consistent with the text, history and tradition of the Second Amendment.

This three pronged challenge to the specific provisions raised is not intended to absolve the broader enactment of firearms regulations from being also being unconstitutional as discussed more below, but it is sufficient to address the current harms for which relief is presently sought.

"General federal domestic legislation in this area [i.e., firearms] may be traced to two enactments, first, the National Firearms Act of 1934, 48 Stat. 1236-1240, originally codified as 26 U.S.C. § 1132, now codified, as amended, as chapter 53 of the Internal Revenue Code of 1986, 26 U.S.C. §§ 5801- 5872, and, second, the Federal Firearms Act of 1938, 52 Stat. 1250, originally codified as former 15 U.S.C. § 901-910, now repealed, the provisions of which, as amended and supplemented, have been carried forward to chapter 44 of Title 18, 18 U.S.C. §§ 921 et seq." *U.S. v. Lopez*, 2 F.3d 1342 (5th Cir. 1993)

The National Firearms Act of 1934 and its many various iterations since (e.g.,

27

Federal Firearms Act of 1938,  Omnibus Crime Control and Safe Streets Act of

1968, Gun Control Act of 1968, Firearms Owners' Protection Act of 1986,

Undetectable Firearms Act of 1988, Anti-Drug Abuse Amendments Act of 1988,

Crime Control Act of 1990, Gun-Free School Zones Act of 1990, Brady Handgun

Violence Prevention Act of 1993, Violence Against Women Act of 1994, etc., etc.)

are all part of legislation that was originally enacted as a tax measure, that is, its

purpose is to raise revenue; therefore, provisions of the regulations which deviate

from the purpose of raising revenue lack constitutional basis with the sole

exceptions being where certain provisions are made under separate reliance on the

Commerce Clause or another enumerated power in the Federal Constitution.

In a bird's eye view . . . does the NFA of 1934 and numerous related

firearms related acts which were enacted in its wake actually have historical

analogues addressing the same societal problem in the same manner?

Or has there been a charting of a new course, moving the sails to take a new tack,

to address the same old societal problem in very different ways?

While a tax is not directly at issue in this case, what other tax provision

exists for which the penalty for non-payment of a $200.00 tax is severe criminal

penalties of imprisonment and imposition of enormous fines? What other $200.00

tax has been suggested because that amount was the average cost of the product

and a 100-percent tax would thereby be imposed? See discussion about the

National Firearms Act:  Hearings Before the Committee on Ways and Means,

U.S. House of Representative, 73rd Cong., 2d Sess., 6 (1934) at 12.  These taxes

and penalties should be found to be *prima facie* evidence of Second Amendment conduct being  "singled out for special – and specially unfavorable – treatment." *McDonald v. City of Chicago*, 561 U.S. 742, 779-80 (2010) (plurality opinion). The fundamental constitutional right of individuals to bear arms in public for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U. S., at 780 (plurality opinion)." *New York State Rifle and Pistol Association v. Bruen*, 597 U.S. ____ (2022) (The advisory dicta in *Heller* concerning use of "dangerous and unusual" in historical laws, as shown herein, did not follow the holding in *Bruen* that the analysis to be used for the Second Amendment is to favor the interpretation of liberty when there are multiple interpretations. Leaving out sources after 1868, the very same sources looked to in *Heller* would provide (overwhelmingly so) for the reasoned interpretation which applies "dangerous and unusual" to *conduct* with weapons, not to *weapons* themselves, i.e., regulating how certain weapons are used. It is not credibly arguable that *regulating conduct* is not the most  reasonable interpretation of those historical laws and that interpretation also leans more toward liberty than applying a description of "dangerous and unusual" to a classification of weapons rather than a classification of conduct (like "affray").

## ANTI-POWER OF THE BILL OF RIGHTS

The Constitution vests Congress only with those legislative powers that are "herein granted." Unlike state legislatures that enjoy plenary authority, Congress

has authority only over the subject matters specified in the Constitution and that *authority* of Congress is *subject to* the *individual rights* referred to in the Bill of Rights, some of those rights referenced expressly (e.g., First and Second Amendments) and others referenced by reservation (i.e., Tenth Amendment).

The Constitution provided Congress with the *enumerated power* to make laws *limited to certain subject matters* including taxation and interstate commerce. That constitution was then amended to remove or limit some of that power to make laws including laws that would entrench upon individual rights of the people. That is, it was amended to place absolute limits on that power to make laws including laws concerning other subject matters including taxation and interstate commerce. Two of the absolute limits on the power of Congress to makes laws concerning taxation and interstate commerce were regarding two specific pre-existing rights, namely that "Congress shall make no law" […] "abridging the [pre-existing] freedom of speech" and that "the [pre-existing] right of the people to keep and bear arms, shall not be infringed".

Congress has no more power to make a taxing law or a law regulating interstate commerce that would infringe the right of the people to keep and bear arms any more than Congress has power to make a taxing law or a l aw regulating interstate commerce that would abridge the freedom of speech.

Does the preeminent position of the Bill of Rights, i.e., by virtue of its enactment/amendment subsequent to the constitution of 1789, serve as anti-power to the previously enacted enumerated powers given to Congress? This should not

30

be a difficult question to answer in the affirmative based on simple logic seen all

through law of the ages. Amendments take precedence of the original enactments.

And if the protection of the right to keep and bear arms has preeminence over

the enumerated Taxing Power and the Commerce Power, is the right to now

be balanced against the governments interests in exercising those powers?

Or did the people perform that balancing by their enactment (through ratification

by their States) of the Second Amendment's unequivocal protection of the right

to keep and bear arms?

"The very purpose of a Bill of Rights was to withdraw certain subjects from

the vicissitudes of political controversy, to place them beyond the reach of

majorities and officials, and to establish them as legal principles to be applied by

the courts. One's right to life, liberty, and property, to free speech, a free press,

freedom of worship and assembly, and *other fundamental rights* may not be

submitted to vote; they depend on the outcome of no elections." *West Virginia

State Board of Education v. Barnette*, 319 U.S. 624, 637-38 (1943) (emphasis

added) Even international treaties with other nations would not be constitutional

if they infringed on the people's right to keep and bear arms such as a "Small Arms

Treaty" that requires all treaty nations to pass laws prohibiting possession of

handguns or certain ammunition.

31

While the Taxing Power and the Commerce Clause powers, indeed, have

a great amount of power, the other provisions of the Constitution serve to take

some power (some policy choices) off the table including provisions added later

through amending the Constitution. Just as the First Amendment would surely

take some Taxing Power or Commerce Clause power off the table (e.g., no

"gathering tax" on peaceful public assembling) and just as the Fourth Amendment

would surely take some Taxing Power or Commerce Clause power off the table

(e.g., no "Papers Please!" type of searches, i.e., searches as a matter of course

whenever crossing state boundary lines), so too, the Second Amendment can and

does limit those powers as well. Just as all later enacted Amendments can alter the

reach and force (scope and power) of earlier enacted Amendments (e.g., the

Fourteenth extending the reach of due process and equal protection protections ) so

too, the other Amendments (colloquially known as the Bill of Rights) served to

alter the scope and power of pre-existing provisions in the constitution. Plenary

administrative searches might have been found to be without bounds, power-wise,

under some provisions but for the limits on those search powers effectuated by the

Bill of Rights, likewise for regulations on speech, etc. The Second Amendment is

no different in that it constrains both the Taxing Power and the Commerce Clause

power as to their capability to infringe on the right to keep and bear arms. So,

where is the limit on Taxing power and Commerce Clause power in relation to the

right to keep and bear arms? That answer is plain from the text: At the precise point those powers cause the slightest infringement to the right. The plain reasoning for that absolute limit was expressed in *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822), the highest court in Kentucky near to the time of ratification of the Second Amendment. ( The history seen through the *Bliss* court sits in a notable position because 'when it comes to interpreting the Constitution, not all history is created equal. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen* quoting *Heller* at 554 U. S., at 634–635 (emphasis added).' ) And existence of an absolute limit for the Second Amendment is not unique. The First Amendment also has an absolute limit on infringement of speech: viewpoint discrimination is not permissible under any level scrutiny. "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials, and to establish them as legal principles to be applied by the courts." *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 637-38 (1943). Indeed, the Second Amendment took some Taxing and Commerce power policy decisions off the table. "While States are, of course, free to provide more protection for the accused than the Constitution requires, see *California v. Ramos*, 463 U. S. 992, 1014 (1983), they may not provide less"

*Simmons v. South Carolina*, 512 U.S. 154, 174 1994. The "Constitution sets a floor for the protection of individual rights. The constitutional floor is sturdy and often high, but it is a floor. Other . . . government entities generally possess authority to safeguard individual rights above and beyond the rights secured by the U.S. Constitution." *American Legion v. American Humanist Assn.*, 139 S.Ct. 2067, 2094 (2019) Kavanaugh, J., concurring.

Having an alternate basis for enacting regulation, while necessary, is not sufficient if the use of the power impermissibly infringes on fundament rights especially those enumerated rights of the first ten Amendments and especially those enumerated fundamental rights which clearly and expressly declare that they will not admit of any exception. Use of "shall not be infringed" is as clear and express of a declaration as any that could be reasonably thought of for indicating that no exceptions to infringement are permissible.

The 1934 Congress was simply wrong in its assessments about the Taxing powers and Commerce Clause powers in relation to the regulation of firearms. They got it backwards. The question is not -- does regulating firearms bear some relation to interstate commerce or tax revenue? – rather, the appropriate question is -- does the exercise of the taxing power or the commerce clause power infringe at all on the right to keep and bear arms? If it does, it has exceeded its limits. Period, full stop. No second step.

34

Would the States that ratified the first ten Amendments thought it permissible for the federal government to place a tax on sales and transfers of firearms for the purpose of raising revenue for the federal government? Or would their collective jaws have dropped at the mere suggestion of doing so?

Unfortunately, virtually all of the inferior courts also got the question backwards and many still continue to get it backwards even after the *Bruen* decision. The reason for this continuing deviation might stem from dicta in *Heller* and *Bruen*, which dicta was apparently to ease the shock of what the apparent results would be, results many might find to be "startling". Even Justice Scalia might have been a little bit startled at what the Second Amendment actually protects under the original public meaning which barred all power of Congress to infringe upon the right to keep and bear arms.

While the Congressional record appears to reveal an intent by Congress to use the taxing power to restrict firearms in order to skirt the protections of the Second Amendment, the court need not look to the intent of the legislation, it need only look at the regulations themselves to see if the regulations burden presumptively protected conduct, that is, is there any conduct affected by the legislation that falls within the text of the Second Amendment. The Second Amendment analysis aids in weeding out whether or not a regulation is doing

indirectly what a regulation is not permitted to do directly by requiring that the

regulation be supported by history and tradition, that is, by requiring the existence

of some historical analogue. And if the government offers a proposed analogue that

addressed the same societal problem but used different means to address the

problem than the regulation under review, then that weighs against the regulation

being permissible.

### *TAXING POWER*

18 USC § 922(t) is an unconstitutional exercise of the Taxing Power of

Congress because of failing to be consistent with raising revenue and because

there is no historical analogue showing that it was permissible to tax firearms

under the Second Amendment. The power to tax is the power to destroy.

If Congress had a free hand to tax despite the Second Amendment protection,

it could tax the militia out of existence. Congress well understood that principle in

1934.  It is quite apparent that the *Bruen* decision tentatively overruled or

abrogated *Sonzinsky v. United States*, 300 U.S. 506 (1937) conditioned on

whether or not the government  can adduce the necessary historical analogue to the

tax at issue, that is, the tax imposed by the National Firearms Act (NFA). And if

the government makes no such showing of a comparable regulation with a

comparable burden addressing similar interests (WHY) in similar manner(HOW),

then the NFA tax is unconstitutional and severance of that tax from the NFA leaves

the NFA without constitutional basis except for a potential basis in the Commerce

Power, discussed more below.

While there have been claims that firearms regulations addresses the interest by Congress in raising revenue under the taxing power, a number of provisions, which have crept in over the years since the initial adoption of the first federal regulations on firearms in 1934, have strayed far from any semblance of an interest in raising revenue, including 18 USC § 922(t).

The Brady Handgun Violence Prevention Act of 1993 was the first federal regulation to enact provisions requiring NICS background checks . The very name of that Act belies a purpose as tax measure. Apart from the title of the Act, what is clear from the implementing text of the provisions regarding NICS background checks is that they do not serve to help raise revenue because those provisions, if anything, reduce the number of purchases (and thereby tax revenue generated) for firearms and also involve a high administrative cost to the government to administer the NICS processes.

The First Amendment and the Second Amendment were post-enactment of the Taxing Power and to claim that the government may tax the firearm sector (firearm purchasers) of the people differently than taxes on other sectors (e.g., sales taxes on knives) would be in the same vein as saying the tax on printer's ink could be double the tax applied to low-fat milk. See *Minneapolis Star Tribune Company v. Commissioner*, 460 U.S. 575 (1983), a case involving taxation of First Amendment related commodities, where it was held that the First Amendment does not permit applying different taxes to different sectors of the press unless there is a countervailing interest of compelling importance that cannot be achieved

with any less restrictive means. The test under the Second Amendment would be –

was there a history and tradition of taxing firearms in 1791?

   If the enactment of 18 U.S.C. § 922(t) falls beyond the power delegated to

the Federal Government by the Taxing Power and restricted by the Second

Amendment, then the court should declare it to be unconstitutional.

<em>COMMERCE CLAUSE POWER</em>

   The provision of 18 USC § 922(t)  provide no clear indication of Congress

relying on the Commerce Clause as their source of federal authority but presuming

that Congress properly asserted reliance upon the Commerce Clause, the authority

available under that power was exceeded and undercuts long established principles

of comity and federalism as codified under the Tenth Amendment.

   18 USC § 922(t) is an unconstitutional exercise of the authority granted to

Congress under the Commerce Clause not only because it regulates some conduct

that is purely intrastate but because all of the regulated conduct (intrastate and

interstate) invades State sovereignty of a role traditionally exclusive to the States.

It is no secret that "the general control of simple firearms possession by ordinary

citizens, have traditionally been a state responsibility" *U.S. v. Lopez*, 2 F.3d 1342,

1364 (5th Cir. 1993). That is what history and tradition show under the framework

set out by *Bruen*. For a large portion of its citizenry, including CLARK, the State's

control over which of its citizens may or may not possess a firearm is overridden

through the implementation  (i.e., NICS) pursuant to 18 U.S.C. § 922(t) and

38

"indisputably represents a singular incursion by the Federal Government into territory long occupied by the States. In such a situation where we are faced with competing constitutional concerns, the importance of Congressional findings is surely enhanced. We draw support for our conclusion concerning the importance of Congressional findings from recent holdings that when Congress wishes to stretch its commerce power so far as to intrude upon state prerogatives, it must express its intent to do so in a perfectly clear fashion." *U.S. v. Lopez*, 2 F.3d 1342, 1364 (5th Cir. 1993)

Further,

"We recognize that the rule being applied in those cases is one of statutory construction. Nevertheless, *Gregory*, *Union Gas*, and *Bass* establish that Congress' power to use the Commerce Clause in such a way as to impair a State's sovereign status, and its intent to do so, are related inquiries. Thus, in *Gregory*, Congress' power to trump the Missouri Constitution was unquestioned but its intent to do so was unclear; hence the Court held that the State's Tenth Amendment interests would prevail." *Id.* at 1365.

This court should not let hope go unrealized.

"[W]e hope to "further the spirit of *Garcia* by requiring that decisions restricting state sovereignty be made in a deliberate manner by Congress, through the explicit exercise of its lawmaking power to that end. . . . [T]o give the state-displacing weight of federal law to mere congressional ambiguity would evade the very procedure for lawmaking on which *Garcia* relied to protect states' interests." L. Tribe, American Constitutional Law § 6-25, at 480 (2d ed. 1988) (footnote omitted)." *Id.* at 1366.

As to 18 U.S.C. § 922(t), the sum total of Congressional commenting for the enactment was "To provide for a waiting period before the purchase of a handgun, and for the establishment of a national instant criminal background check system

39

to be contacted by firearms dealers before the transfer of any firearm."
There is no indication that it was thought, or could be legitimately thought, that
"the transfer of any firearm" would always implicate interstate commerce because
many firearms, especially older family heirlooms, have never traveled in interstate
commerce nor are they likely to ever do so.

In the most generous view, the comments of Congress are ambiguous as to
whether or not NICS applies to only firearms that have traveled in interstate
commerce, but the implementing statutes make clear that whether or not a sought
after firearm has travelled in interstate commerce is not a consideration of, or any
exception to, the requirement of performing a background check.

> "The proper framework for analyzing such a claim [i.e., exceeding the
> power authorized by the Commerce Clause] is provided by the
> principles the Court set out in Lopez. First, in Lopez, the
> noneconomic, criminal nature of possessing a firearm in a school zone
> was central to the Court's conclusion that Congress lacks authority to
> regulate such possession. Similarly, gender-motivated crimes of
> violence are not, in any sense, economic activity. Second, like the
> statute at issue in Lopez, § 13981 contains no jurisdictional element
> establishing that the federal cause of action is in pursuance of
> Congress' regulation of interstate commerce. Although Lopez makes
> clear that such a jurisdictional element would lend support to the
> argument that § 13981 is sufficiently tied to interstate commerce."
> *United States v. Morrison*, 529 U.S. 598 (2000)

The use of NICS by 18 U.S.C. § 922(t) is noneconomic in nature and contains no
jurisdictional element establishing that use of NICS is in pursuance of Congress'
power to regulate interstate commerce because it applies to all attempts to purchase

firearms regardless of whether a particular purchase has no effect on any interstate commerce interest.

> "We rejected these "costs of crime" and "national productivity" arguments because they would permit Congress to "regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce." *Id.,* at 564. We noted that, under this but-for reasoning:

>> "Congress could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example. Under the[se] theories ... , it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign. Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate." *Ibid.*"

> *Id.* at 612.

And from *Morrison:*

> "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation. As we stated in *Lopez,* "'[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so.'" 514 U. S., at 557, n. 2 (quoting *Hodel,* 452 U. S., at 311 (REHNQUIST, J., concurring in judgment)). Rather," '[w]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court.'" 514 U. S., at 557, n. 2 (quoting *Heart of Atlanta Motel,* 379 U. S., at 273 (Black, J., concurring))." *Id* at 612.

The concern that Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority seems to be as well founded in regard to a national background check as it would be for a national identification check at all Interstate Highway crossings between state borders. Papers please!

As to the Commerce Clause, the 1934 congressional "reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption." *Morrison* at 615.

> "We are not the first to recognize that the but-for causal chain must have its limits in the Commerce Clause area. In *Lopez,* 514 U. S., at 567, we quoted Justice Cardozo's concurring opinion in *A. L. A. Schechter Poultry Corp.* v. *United States,* 295 U.S. 495 (1935):
>
>> There is a view of causation that would obliterate the distinction between what is national and what is local in the activities of commerce. Motion at the outer rim is communicated perceptibly, though minutely, to recording instruments at the center. A society such as ours 'is an elastic medium which transmits all tremors throughout its territory; the only question is of their size.'" *Id.,* at 554 (quoting *United States* v. *A. L. A. Schechter Poultry Corp.,* 76 F.2d 617, 624 *(CA2* 1935) (L. Hand, J., concurring))."

*Id.* at 616, footnote 6.

"We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on

interstate commerce." *id.* at 617. In the concurrence by Justice Thomas in *Morrison*, he opined that

> "[t]he majority opinion correctly applies our decision in *United States v. Lopez*, 514 U.S. 549 (1995), and I join it in full. I write separately only to express my view that the very notion of a "substantial effects" test under the Commerce Clause is inconsistent with the original understanding of Congress' powers and with this Court's early Commerce Clause cases. By continuing to apply this rootless and malleable standard, however circumscribed, the Court has encouraged the Federal Government to persist in its view that the Commerce Clause has virtually no limits."

This persistent view of the Commerce Clause by the Federal Government, in all three of its branches, continues to persist over 25 years later, that is, over a quarter of a century after Justice Thomas opined about the nexus test under the Commerce Clause being inconsistent with the original understanding of Congress' powers. What was, perhaps, left unspoken was that this test, even if permitted in some circumstances, cannot be reconciled with circumstances involving the exercise of fundamental rights.

Presuming a corrected course of action is taken to finally break that persistent view, that leads to the asking of an important question – if Congress cannot regulate violent criminal conduct within a State, how may the Federal government regulate a far more State-centric area of regulation such as the sales of firearms (many of which are handguns whose possession is plainly protected by the Second Amendment) with a federal regulation that can (and has in the present case) cause very significant impairments on a law-abiding responsible citizen's

fundamental right to keep and bear arms?

If the enactment of 18 U.S.C. § 922(t) falls beyond the power delegated to the Federal Government by the Commerce Clause powers and restricted by the Second Amendment, then the court should declare it to be unconstitutional.

*THE RIGHT TO KEEP AND BEAR ARMS*

While some provisions of the Constitution provide for an enumerated power, other provisions serve to remove or limit those enumerated powers.

If the statutes at issue are the causation (even if incidental effect) of actions which infringe upon CLARK's conduct of keeping and bearing arms, the next question is the method to be used ( or judicial "test") to analyze the statutes to determine if they are in keeping with the constitution.

To determine whether a firearm regulation is consistent with the Second Amendment, the test of historical inquiry is to be used as part of the analysis.

> 'The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. In some cases, that inquiry will be fairly straightforward. For instance, when a challenged regulation **addresses a general societal problem that has persisted since the 18th century**, the lack of a **distinctly similar historical regulation** addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if **earlier generations addressed the societal problem, but did so through materially different means**, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on

constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.' *Bruen*(emphasis added)

'While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that *Heller* and *McDonald* point toward at least two metrics: **how and why** the regulations burden a law-abiding citizen's right to armed self-defense. As we stated in *Heller* and repeated in *McDonald*, "individual self-defense is 'the *central component*' of the Second Amendment right." *McDonald*, 561 U. S., at 767 (quoting *Heller*, 554 U. S., at 599); see also *id.,* at 628 ("the inherent right of self-defense has been central to the Second Amendment right"). Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "'*central*'" considerations when engaging in an analogical inquiry. *McDonald*, 561 U. S., at 767 (quoting *Heller*, 554 U. S., at 599).' *Bruen* (emphasis added)

'This does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry. Again, the Second Amendment is the "product of an interest balancing *by the people*," not the evolving product of federal judges. *Heller*, 554 U. S., at 635 (emphasis altered). Analogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances, and contrary to the dissent's assertion, there is nothing "[i]roni[c]" about that undertaking. *Post,* at 30. It is not an invitation to revise that balance through means-end scrutiny.' *Bruen* at footnote 7

While courts are not free to engage in balancing tests in this area, the courts can and should look to the historical analogue relied upon to determine if such delays were permissible during application of the historical analogue restriction, that is was the burden of the historical restriction different than the burden the current restriction at issue. It is also pertinent to discount outlier laws, i.e., "outlier

45

compared to the "vast majority of States,"." ( See *Bruen* ) and to give sources only the weight that is due. "We categorize these periods [of history] as follows: (1) medieval to early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; (4) Reconstruction; and (5) the late-19th and early-20th centuries. We categorize these historical sources because, when it comes to interpreting the Constitution, not all history is created equal." *Bruen*.

The "why" appears to be self evident based on the subject matter of the restrictions, enhancing public safety by attempting to keep people safe from violence committed by use of a firearm -- though identifying the specific reason is the defendant(s) purview to assert. That said, the ATF Director recently, through statements made at Shot Show 2023, indicated that the reason was to keep people safe from gun violence. As to the "how", that can be objectively gleaned from the means codified into law.

Part of the how is to place the burden of a background check process upon all citizens seeking to purchase a firearm from an FFL which includes law-abiding responsible citizens, i.e., those who are not "prohibited persons" under the relevant law and; that burden can also include denial of immediate purchase of a firearm by law-abiding responsible citizens even when the purpose of the purchase is only for use in self defense in the citizen's home. This can be a significant burden when the citizen perceives that there is an imminent threat of harm posed to him/her while at his/her home. Because an important (central) part of the historical analysis of an analogue involves comparing the burden caused by the restriction on the conduct

46

of keeping and bearing arms, that analysis should include what burden can arise upon a person's ability to defend from harm in one's own home. When the threat of imminent death or great bodily harm is seconds away - help is only minutes away -- if you have the ability to contact someone. What is the burden in that situation if it occurs because a person was delayed by NICS?

Even if a burden of a "background check" (*New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. ___ (2022) at footnote 10) and a burden of a person demonstrating that he/she is able to successfully "pass a firearms safety course" *Ibid.* are designed to ensure only that those bearing arms in the jurisdiction are, in fact, "law-abiding, responsible citizens." *Ibid.*, because the historical tradition was that "a showing of special need was required *only after* an individual was *reasonably accused* of intending to injure another or breach the peace" *Ibid.*(emphasis added), so too, a showing of a person's "law-abiding, responsible citizen" *Ibid.* status should not be a prerequisite for purchasing or obtaining a firearm by transfer from another person especially without the *individual* being *first* "reasonably accused" *Ibid.* of not being a law-abiding or responsible person *before* a background check or firearms training requirement may be imposed. That is, everyone should start out "with robust carrying rights" *Ibid.* Further, even when a person was "reasonably accused" historically, The *means employed* (HOW) to address the societal problem (WHY) was a requirement of posting a bond and; that *requirement* (means employed) was *only* the payment of a fee(surety), that is, a quick and easy act, rather than facing a ban (prohibition on purchase of a firearm) until *the individual* passes a background check (and/or passed a firearms training course to obtain a state issued permit).

Background checks for some law-abiding responsible citizens can take days and the process is not within the individual's control to expedite completing the burden very much unlike a requirement to simply post a bond or pay a fee.

CLARK's experiences with NICS background checks have almost always caused a delay of at least three business days (often longer because of travel distance and scheduling issues) and have even resulted in several denials which take many weeks or months to appeal and reverse; meanwhile, CLARK not being able to complete the purchase or transfer.

*WHY AND HOW*

Violence committed with guns is a "societal problem that has persisted since the 18th century" *Ibid.* (the WHY) and that very problem was historically addressed by burdening only certain people, not by burdening all law-abiding responsible citizens who sought to purchase or transfer a firearm. The implementation of the NICS background checks burdens all people subject to its use (i.e., those seeking to purchase a firearm from an FFL or transfer a firearm using an FFL) including law-abiding responsible citizens and can exact an extremely heavy burden, even the burden of facing a threat of potentially deadly confrontation unarmed.

The historical manner of addressing the problem dangerous use of firearms was not only limited to certain individuals but, even for those few, the burden was *not* to ban those individuals from purchasing or obtaining a firearm until after they passed a background check or some firearms training but, rather, merely required the simple posting of a modest bond. Further, even if the restricted person did not

48

post a bond, it only restricted carriage of a firearm in public and placed absolutely

no restriction on purchase of a firearm or use of a firearm at the individual's home.

Prohibiting purchase (or transfer) of a firearm necessarily restricts that firearm

from being used at a individual's home for purposes of self defense. A delay in

obtaining a firearm for self defense in an individual's home can be the burden

imposed by the NICS background check and it can be an especially high burden

where a NICS "delay" or "denial" causes days long delay (or even months as has

been the situation with CLARK in multiple instances). The burden of a delay,

even a shorter delay of one hour, can be deadly to the person who is seeking to

make an immediate purchase to address an immediate threat.

If an FFL believed a citizen to be a prohibited person, after any purchase or

transfer, or even if the suspected person engaged in no purchase or transfer, the

FFL could certainly make a reasonable accusation to the proper authority which

would initiate a [due] process that could lead to requiring the posting of a bond.

As to a state issued ATF-qualified alternate permit which could allow an

FFL to allow purchase of a firearm by CLARK without a NICS check, the cost

of obtaining such a permit by a law-abiding responsible citizen as a requirement

of law to exercise a fundamental constitutional right would constitute a license or

a tax, neither of which is constitutionally permissible.

*NICS HISTORY OF NOT BEING EFFECTIVE*

The Office of the Inspector General of the Department of Justice put out a report concerning its review of the NICS process which may be found online at https://oig.justice.gov/reports/ATF/e0406/index.htm

Within the EXECUTIVE DIGEST portion of the report, is was stated that "Our review also found that few NICS cases are prosecuted. During CYs 2002 and 2003, only 154 (less than 1 percent) of the 120,000 persons who were denied during the NICS background check were prosecuted." This "less than 1 percent" is a quite generous description as 0.13% is significantly less than 1%. Comments by the ATF in Appendix 4 of the report contains

> "We strongly believe that one of the principal activities of successful firearms enforcement efforts is the effective referral of firearms denials received from the FBI's NICS Operation Center. As such, ATF continues to assess our practices and procedures to ensure that we are constantly improving this complex process."

While a complex process may be a necessary part of firearms enforcement efforts, the same could likely be said of viewpoint (misinformation) enforcement efforts. But, in either case, the question would be, are such processes acceptable restrictions or do they impermissibly intrude on fundamental constitutional rights?

In a report titled "National Instant Criminal Background Check System (NICS) Operations" produced by the U.S. Department of Justice, Federal Bureau of Investigation, Criminal Justice Information Services Division it was stated that

"From January 1 through December 31, 2014, approximately 9 percent of all transactions processed were given an initial delay status."   See online at https://www.fbi.gov/file-repository/2014-nics-ops-report-050115.pdf/view

<em>AS-APPLIED</em>

Even if the court finds that a NICS background check is a valid historically supportable firearm restriction, the court should determine if the restriction is unconstitutional as-applied to CLARK.

Director Comey of the FBI on September 28, 2016, in testimony under oath before Congressional (House) Oversight committee, acknowledged that resources in performing firearm checks was strained (i.e., a problem). See https://www. c-span.org/video/?415887-1/fbi-director-james-comey-testifies-oversight-hearing near the 3 hr. 21 min. mark into the meeting, concerning a question about the FBI's capacity to handle increasing numbers of criminal background checks, Director Comey answered: "I do believe we have the have the resources. Where we've been strained is on the background checks for firearms purchases. The other background check -uh- processes we run - my overall sense is we have enough troops to do that. We are able to - we charge a fee for those - and I think we're able to generate the resources we need."

Pub. L. 110–180, Jan. 8, 2008, 121 Stat. 2559, provided that:

"SECTION 1. SHORT TITLE AND TABLE OF CONTENTS.
"(a) SHORT TILE [sic].—This Act may be cited as the
  'NICS Improvement Amendments Act of 2007'.

And Amended section 103 of Pub. L. 103–159, provide in relevant part, that
  "(B)
  "(2) DEPARTMENT OF JUSTICE.—The Attorney General shall—
  "(A) ensure that any information submitted to, or maintained by, the
  Attorney General under this section is kept accurate and confidential, as
  required by the laws, regulations, policies, or procedures governing the
  applicable record system;
  "(B) provide for the timely removal and destruction of obsolete and
  erroneous names and information from the National Instant Criminal
  Background Check System; and

CLARK is a law-abiding, adult citizen, that is, not a "prohibited person"

under the relevant statutes (as supported by multiple letters from FBI) and;

CLARK does not possess a state issued ATF-qualified alternate permit and;

CLARK is part of "the people" whom the Second Amendment protects. The

firearms which CLARK sought and seeks to obtain by purchase or transfer,

include a handgun, which is a weapon "in common use" today by American

citizens for self-defense, for protecting himself at his home. Thus, as in *Bruen*,

the court should have "little difficulty concluding also that the plain text of the

Second Amendment protects" *Ibid.* the proposed course of conduct of purchasing

a handgun for use at one's home for self-defense. As noted in *Bruen*,

> "[n]othing in the Second Amendment's text draws a home/public
> distinction with respect to the right to keep and bear arms, and the
> definition of "bear" naturally encompasses public carry.

Moreover, the Second Amendment guarantees an "individual right to possess and carry weapons in case of confrontation," *id.*, at 592, and confrontation can surely take place outside the home. Pp. 23–24." *Ibid.*

## *"KEEP ARMS" AND "BEAR ARMS"*

*Heller* correctly identified that "[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *United States* v. *Sprague*, 282 U.S. 716,731 (1931) but this does not mean one of several ordinary meanings must be the exclusive meaning and; normal meanings may, of course, include an idiomatic meaning, but it excludes secret meanings or technical meanings that would not have been known to ordinary citizens in the founding generation.

## *IN COMMON USE "TEST"*

The "in common use for lawful purposes" test as seen in Heller concerning the scope of the protection of the Second Amendment is an unnecessary test and stems from an inaccurate description of the historical treatment of arms concerning "dangerous and unusual" because it describes "dangerous and unusual" as applying to a *class of weapons* rather than a *class of conduct*. That is, the historical tradition of prohibiting "dangerous and unusual *conduct*" was inaccurately described as prohibiting "dangerous

and unusual *weapons*".

The government's brief in *United States v. Miller*, 307 U.S. 174 (1939)

identified that, historically, there were prohibitions concerning the *manner of use*

of arms such as when associated with *conduct* of terrorizing people.

> "The Government's brief spent two pages discussing English legal sources,
> concluding "that at least the carrying of weapons without lawful occasion or
> excuse was always a crime" and that (because of the class-based restrictions
> and the *prohibition on terrorizing* people with dangerous or unusual
> weapons)" *Heller* (emphasis added).

*Heller* properly downplayed the *Miller* case in noting that

> "[t]he defendants made no appearance in the case, neither filing a
> brief nor appearing at oral argument; the Court heard from no one but
> the Government (reason enough, one would think, not to make that
> case the beginning and the end of this Court's consideration of the
> Second Amendment)." *Id.* at 99

and further noted in regard to *Miller* that

> "[a]s for the text of the Court's opinion itself, that discusses *none* of
> the history of the Second Amendment. It assumes from the prologue
> that the Amendment was designed to preserve the militia, 307 U. S., at
> 178 (which we do not dispute), and then reviews some historical
> materials dealing with the nature of the militia, and in particular with
> the nature of the arms their members were expected to possess, *id.*, at
> 178–182. Not a word *(not a word)* about the history of the Second
> Amendment. This is the mighty rock upon which the dissent rests its
> case." *Id.*

but then *Heller* placed heavy reliance on *Miller* by stating:

> "We also recognize another important limitation on the right to keep
> and carry arms. *Miller* said, as we have explained, that the sorts of
> weapons protected were those "in common use at the time." 307 U. S.,

54

at 179. We think that limitation is fairly supported by the historical
tradition of prohibiting the carrying of "dangerous and unusual
weapons." See 4 Blackstone 148–149 (1769); 3 B. Wilson, Works of
the Honourable James Wilson 79 (1804); J. Dunlap, The New-York
Justice 8 (1815); C. Humphreys, A Compendium of the Common Law
in Force in Kentucky 482 (1822); 1 W. Russell, A Treatise on Crimes
and Indictable Misdemeanors 271–272 (1831); H. Stephen, Summary
of the Criminal Law 48 (1840); E. Lewis, An Abridgment of the
Criminal Law of the United States 64 (1847); F. Wharton, A Treatise
on the Criminal Law of the United States 726 (1852). See also *State* v.
*Langford*, 10 N. C. 381, 383–384 (1824); *O'Neill* v. *State*, 16 Ala. 65,
67 (1849); *English* v. *State*, 35 Tex. 473, 476 (1871); *State* v. *Lanier*,
71 N. C. 288, 289 (1874)." *Id.*

This conclusion that a limitation on which arms are protected "is fairly supported

by the historical tradition of *prohibiting the carrying* of "dangerous and unusual

weapons." *Ibid.* (emphasis added)  stretches historical treatment of certain *uses* of

weapons to sweep in the *mere possession* of the same certain weapons. This

stretching of a prohibition on *conduct* to be considered to be a "fairly supported"

reason to also prohibit *mere possession* stretches the historical treatment of arms.

And the twelve sources cited (more on that later) do not fairly support conflating

*use of a weapon* with the *mere possession of a weapon*. And to say that prohibition

on the one (conduct) requires prohibition of the other (possession) would be to

construct a false dichotomy.

Any limiting of which arms are protected as to their possession

by use of  an "in common use" test is not consistent with the historical record as

will be identified in more detail, infra, but for the sake of argument, assuming that

such test were the proper measure for dividing arms into categories of protected

and unprotected, what facts can be considered for the legal conclusion about "common use for lawful purposes"? Quantifiable numbers of a weapon possessed by law abiding citizens? Perhaps pro-rated quantifiable numbers based on population change over time? Numbers (or Pro-rated Numbers) nationally? or based on a given locality? For example, if everyone in a small town of 300 people has a certain specific type of weapon but no one else in the entire country possess such a weapon, is it in common use as to those people in that small town? These are questions which should never need to be asked in relation to whether or not *mere possession* of any particular arms is protected by the right to keep and bear arms. While "in common use for lawful purposes" might be a fact that can be used to definitively conclude that certain arms are not "unusual", the real question is – What type of protection does "in common use for lawful purposes" provide? Does that mean one may keep and bear such weapons in any and all manners whatsoever? And does that mean that *mere possession* of arms which are not in common use for lawful purposes may be completely prohibited? Logically, the right must protect, at minimum, *mere possession* of all arms. If it were otherwise the government could completely prohibit innovation of new arms by making them illegal before they came to be in common use.

## "DANGEROUS AND UNUSUAL WEAPONS" TEST

That all arms are protected by the right concerning *mere possession* would not mean that all arms may be kept and borne "in any manner whatsoever". Those *manners* of keeping or bearing arms which make them "dangerous and unusual" was not protected historically.

*Heller* correctly determined that a balancing test of interests is inappropriate for interpreting the Second Amendment because the people performed the balancing test as part of their enactment of protection of the right to keep and bear arms. But what about the stealthy balancing test performed by *Heller* itself concerning its conclusion about "dangerous and unusual weapons"? It is worth repeating that "it is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." *Byars v. United States*, 273 U.S. 28, 32 (1927).

It is a mistaken view of the historical record to limit the Second Amendment to small arms used for self defense by the people and leave out protection for large arms used to bear on targets of hostilities by the militia because those arms of the militia were arms of the same people that enacted the Second Amendment because the militia spoken of in the Second Amendment was the people themselves.

Historically, laws regulating arms in the context of "dangerous and unusual" was limited to certain type of arms which were considered unusual and, more so,

limited to prohibiting the keeping or bearing of those arms in *certain manners* that pose a danger, that is, manners which would naturally terrify law abiding citizens -- commonly known as engaging in an affray, brandishing firearms, etc.  It was this "*category of conduct*" that historically fell outside of the protection of the right to keep and bear arms, not a "*category of weapons*".

If *lawful use of any particular weapon* fell outside of the scope of protection of the right to keep and bear arms, that would be destruction of the right of self defense. For example, what if a law abiding responsible person is unarmed and five young men from a local gang approach and start attacking that person. And what if one of gang members drops a weapon, a weapon which falls within some "category of weapons" that are deemed to be "dangerous and unusual". And what if the person being attacked grabs that weapon and uses it against the attackers and drives them off -- Is that person now subject to be charged with possession of a "dangerous and unusual weapon"? Does a prohibition on *mere possession* or *lawful use* of a "dangerous and unusual weapon" trump some acts of self defense?

If the "WHY" about "dangerous and unusual" suffices to allow regulating some arms, presumably the regulation has to be consistent with the historical "HOW" (manner) of regulation.

The *HOW* is a substantial tradition of *allowing mere possession*  of the

unusual weapons but restricting certain uses (conduct) and dispositions (sales/gifts) of those weapons. In this author's review, there were only two laws found that made it unlawful to even possess – but they were post-1868 – Illinois 1881 and Michigan 1929.  Based on a review of a compilation of early laws as can be found in a paper at http://ssrn.com/abstract=2200991 titled "Firearms and Weapons Legislation Up To The Early Twentieth Century Compiled" by Mark Frassetto and; by reviewing the twelve resources cited by *Heller*(2008) ( See also https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1859395 ), it can be identified that there were four(4) distinct types of laws concerning "dangerous and unusual" which will be labeled as A through D below:

**A:** <u>Mere possession was lawful</u> but made conduct unlawful including

the setting a trap (i.e., armed to activate or fire off without further

conduct by the one who arms it) or; discharge while near public street

or highway or; when in a group of people that threatens or terrifies

(i.e., apprehension of extreme harm to come) otherwise described as

an affray or; conduct that results in a death of a person.

**B:** <u>Mere possession was lawful</u> but prohibited from carry or make or

required a tax be paid on to selling or giving away

**C:** <u>Mere possession was lawful</u> but required "registration" (much like NFA)

**D:** Unlawful to possess.

TYPE A has support from near 1791 but does not make mere possession unlawful, rather it only regulated conduct.

TYPE B has no support until 1837 (After all signers of the constitution had passed away (1826)) and prohibited or taxed sales and gifts, not mere possession.

TYPE C and TYPE D have no historical support before 1868.

### *SOME LAWS ASSOCIATED WITH EACH OF THE TYPES*

**TYPE A:**

New Jersey: 1771 N.J. Laws 346, "set any loaded in such manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance"

Michigan: 1875 Mich. Pub. Acts 136, An Act To Prevent The Setting Of Guns And Other Dangerous Devices, § 1

South Dakota: S.D. Terr. Pen. Code § 457 (1877), as codified in S.D. Rev. Code, Penal Code (1903) § 469

Vermont: 1884 Vt. Acts & Resolves 74, An Act Relating To Traps, § 1

Ohio: 1877 Ohio Laws 278, Offenses Against Public Policy, § 60

New Jersey: The Grants, concessions, and Original Constitutions of the Province of New Jersey, 289 (1758)

**TYPE B:**

Alabama: An Act to Suppress the Use of Bowie Knives: Section 2. June 30, 1837

Massachusetts: Mass. Gen. Law (1850), chap. 194 §§ 1, 2 as codified in Mass. Gen. Stat., chap. 164 (1873)

Florida: Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892) 2425.

Tennessee: Act of Jan. 27, 1838, chap. 137 at 1837-1838 Tenn. Pub. Acts 200

Rhode Island: 1896 R.I. Pub. Laws 50, An Act Concerning Explosives Used In Fire Crackers, chap. 342, § 1

Tennessee: Tenn. Pub. Acts (1879) Chap. 96, as codified in Tenn. Code (1884)

Oklahoma: 1890 Okla. Sess. Laws 475, Crimes Against The Public Health And Safety

**TYPE C:**

Georgia: 1921 Ga. Laws 247

**TYPE D:**

Illinois: Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885) 88. Possession or sale forbidden § 1

Michigan: Pub. Acts 1929, Act No. 206, Section 3, Comp. Laws 1929, § 16751

*SOME LAWS WERE ENACTED BASED ON A*
*FUNDAMENTAL MISUNDERSTANDING OF*
*THE RIGHT TO KEEP AND BEAR ARMS*

In *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. __ (2022), the court stated that "[w]hen States generally prohibited both open and concealed carry of handguns in the late-19th century, state courts usually upheld the restrictions when they exempted army revolvers, or read the laws to exempt at least

61

that category of weapons." but went on to say that "[t]hose state courts that upheld broader prohibitions without qualification generally operated under a fundamental misunderstanding of the right to bear arms, as expressed in *Heller*. For example, the Kansas Supreme Court upheld a complete ban on public carry enacted by the city of Salina in 1901 based on the rationale that the Second Amendment protects only "the right to bear arms as a member of the state militia, or some other military organization provided for by law." *Salina* v. *Blaksley*, 72 Kan. 230, 232, 83 P. 619, 620 (1905). That was clearly erroneous. See *Heller*, 554 U. S., at 592." *Id.*

### THE TWELVE HELLER SOURCES

All but one of the twelve sources fall into TYPE A above.

4 Blackstone 148-149 (1769) and H. Stephen, Summary of the Criminal Law 48 (1840) both concerned the statute of Northampton which *Bruen* placed squarely in TYPE A above.

3 B. Wilson, Works of the Honourable James Wilson 79 (1804), J. Dunlap, The New-York Justice 8 (1815), C. Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822), 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271-272 (1831), E. Lewis, An Abridgment of the Criminal Law of the United States 64 (1847), an F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852) are all concerning an *affray* which is

*conduct* beyond *mere possession*, that is, they all fall within TYPE A above.

State v. Langford, 10 N.C. 381, 383-384 (1824), O'Neill v. State, 16 Ala. 65, 67 (1849), State v. Lanier, 71 N.C. 288, 289 (1874) each address situations more in the vein of "brandishing a firearm" or "assault with a weapon" which is *conduct* beyond *mere possession*, that is, they fall within TYPE A above.

Lastly, *English v. State*, 35 Tex. 473, 476 (1871) is a case is in the vein that the Second Amendment only protects military arms - which is not consistent with *Heller* or *Bruen,* nor even *Miller*.

In summary of these historical sources, the overwhelming historical HOW to deal with "dangerous and unusual" was not to prohibit mere possession of any weapons but to either tax or prohibit  sales and gifting of certain unusual weapons. And there certainly was no historical source showing that mere possession any weapon constituted a crime even if the weapon was explicitly associated with "dangerous and unusual".

*BALANCING TESTS*

Determinations using tests such as "dangerous and unusual weapons" and "in common use for lawful purposes" are nothing more than determination made through the use of balancing tests because those test themselves were derived by balancing what historic sources show about the scope of the right to keep and bear arms. Thus, proper balancing of historical sources is mission critical in arriving

at the original public meaning. To be sure, the review of historical sources in

*Heller* was not an exhaustive review (which review was self admittedly not even

necessary in that it was an advisory opinion – "We may as well consider at this

point (for we will have to consider eventually) what types of weapons *Miller*

permits.") but, more importantly, did not follow all of the interpretive principles

set forth in *Bruen*, such as "when it comes to interpreting the Constitution, not all

history is created equal." *Id.* and beyond weighing based on the timeframe in

relation to the ratification of the right, historical statutes and case law were also

to be interpreted, as with all other enumerated fundamental rights are today under

the rule of lenity, "[t]o the extent there are multiple plausible interpretations of

[a historical source], we will favor the one that is more consistent with the

Second Amendment's command."

Each of these tests produce results which are malleable and the protection of

the Second Amendment is anything but malleable. That is, they permit (thus would

demand as applied) a changing scope of the protection of the Second Amendment,

thus, neither the "dangerous and unusual weapons" nor the "in common use for

lawful purposes" fall within common sense as common sense does consider absurd

results to be sensible.

While "in common use for lawful purposes" and "dangerous and unusual

weapons" may be rational principles, they are not appropriate principles for guiding the boundary of the people's enumerated fundamental right to keep and bear arms as protected by the Second Amendment of the federal constitution.

### MALLEABLE PROTECTION OF THE SAME IDENTICAL ARMS (INCONSISTENT SCOPE OF PROTECTION)

A weapon which is determined, today, to be a dangerous and unusual weapon, through passage of time wherein some unusual weapon, through choices made by the people, may become very usual in the practice and exercise of the right by the people. One may say, well, that just expands the number of weapons protected but that would ignore the contrary choices which might be made, such that a very common weapon today may become nearly extinct and only be found to be rare antiques in the future and allow a future determination that they are have become unusual and thus no longer within the scope of the protection of the Second Amendment. No other enumerate fundamental right allows for a rational principle or test to be of a nature that allows the very scope of the right to change based on passage of time or change in the choices made by the people.

### ABSURD RESULTS

Appellate judges tend to engage in thought experiments. The Justices on the Supreme Court often ask hypothetical questions of counsel framing the issue in different ways to see how the analysis fits (or doesn't fit), that is, to see whether it

65

produces absurd results. While the observation in Heller about "in common use for lawful purposes" may work in some self defense aspects of framing of the 2A issue, it does not work in many other aspects, and, notable, it completely fails in the "prefatory clause" aspect (i.e., use for militia) even while admitting that the militia aspect is part of the scope of the right's protection. See " "Keep arms" was simply a common way of referring to possessing arms, *for militiamen* and everyone else." *Id. (emphasis added)*; see also "Nothing in the passage implies that the Second Amendment pertains *only* to the carrying of arms in the organized militia." *Id.* at footnote. (emphasis added) The right to "keep Arms" as an individual right unconnected with militia service is not required to be exclusive with the right also being a right connected with militia service, in fact, the prefatory clause could not emphasize that any more than it did. *Heller* confirmed the Second Amendment protect "the right to "keep Arms" as an individual right unconnected with militia service" but left the other protections, such as for militia and various other activities such as hunting) dangling, perhaps for another day. That day has come and gone and some courts are in seeming disarray grasping at the air as to these in dictum balancing tests found in the dicta of *Heller* and unconnected to any substantial evidentiary record.

One hypothetical with absurd results, what if -- some natural phenomenon occurred like a blast of a certain type of gamma rays that had been travel for

thousands of light years and passed through our solar system which caused all ferrous metals to crumble into dust. While the residual ore of crumbled firearms could be eventually be reused to form new firearm, what if - the government had twenty million tasers unaffected and still in use as they were made only from plastic, copper, and lead and; some old boy down in Mississippi had long ago crafted a replica of a Colt 45 revolver using aluminum instead of steel. And someone in Georgia had a hand held railgun made from only copper and plastic that can fire a one ounce projectile at 1300 feet per second and the inventor who had given that railgun away lived in Wyoming and had created another nearly identical railgun but it was capable of firing the same projectile at 3,000 feet per second. So, what if -- we the people of over 100 million strong had two railguns and one revolver among us and the government had twenty million tasers. Could the government ban possession of the two railguns and the one revolver because they are not in common use?

Another hypothetical with absurd results - what if -- the government has ZERO "newfangled" firearms and among millions of We The People, there were only two "newfangled" firearms, one newly invented by Smith and one newly invented by Wesson. Would those "newfangled" firearms be in common use? Would they be protected under the Second Amendment?

What of the quill and ink well as compared to computerized laser printing? Does the quill and ink well fall from under the scope of the First Amendment because it has fallen into disfavor with the people? Or because some lead based ink and razor sharp quills have become dangerous and unusual instruments for communication of ideas?

## WHAT IS THE PROPER TEST?

To be constitutionally usable (permissible under due process),  both of these tests, because of potential malleability and absurdity, can only be confirmatory, not determinative, of the scope of the right. That necessarily means there must be another test for determining whether certain things fall within the scope of protection of the Second Amendment. That test was applied by the people who ratified the protection of the right … and it is multi-pronged as evidenced by the prefatory and operative clauses.  Is the thing an armament that can be utilized by the people's militia to defend against hostilities or be offensively deployed against targets of hostilities? If so. It is protected (prefatory clause). Is the thing an armament that can help facilitate self protection or protection of other individuals in case of conflict or confrontation? If so. It is protected (operative clause).

This does not mean that "dangerous and unusual CONDUCT" cannot be used as a determinative principle and, to be sure, it clearly should be used.

Form of "conduct" using any number of assorted arms could be assuredly

regulated or prohibited, notably, including murder by use of firearms. But

application of "dangerous and unusual" to inanimate objects as opposed to

animated *conduct* can stand as nothing but an open-ended balancing test which is

both malleable and prone to absurdity. The scope of the rights enshrined in the Bill

of Rights does not change, and allowing use of tests that effect that end are not

worthy of continued use even if they may "seem" to be workable test - which they

have not actually been demonstrated to be except for the "confirmatory" aspect of

"in common use", but, again, confirmation is not needed when the scope, as shown

by history, includes all arms, defensive and offensive.

### *BEARABLE ARMS*

The Supreme Court of the United States, in *District of Columbia v. Heller*,

554 U.S. 570 (2008), though professing that it did "not undertake an exhaustive

historical analysis today of the full scope of the Second Amendment, did

affirmatively opine on the meanings of "keep arms" and "bear arms" and gave an

appearance to the rational reader that the meaning of "bear arms" in association

with the preposition "against" was excluded from the historical meaning. Such a

conclusion would be unsupportable from the face of the Second Amendment's

prefatory clause.

Both "for" and "against" are prepositions, neither of which need be

exclusive to the meaning of "bear arms", nor do other propositions beyond those need fall outside of the meaning of "bear arms" in the Second Amendment.

If the meaning of "bear arms" is to be limited by certain prepositions associated with historical uses of "to bear" then that limitation would constitute a balancing of "the right to keep and bear arms" through stealthy means of linguistics. The *Heller* decision itself disavowed that any balancing would be appropriate and it should be acknowledged that such rejection of balancing should also apply in the context of the meaning of "bear arms" when used as language to construct a constitution.

If the meaning of the Second Amendment is to include, as it must, the right to keep and bear arms *against* "targets of the hostilities" identified by the *militia* else the prefatory clause of the right would be alarmingly out of place. And, of course, history shows that "bear arms" also appropriately means *for* self defense.

The right to keep and bear arms "against" something *and* "for" something are not incompatible with discerning the broad meaning of the right. Constitutional language is usually broad for just that reason. Considering the times of the founding and the founders familiarity with such "Arms", it would be an odd reading to leave such some specific meanings out of "bear arms" based on the lack of use of the preposition "*against*" in the literal text. Would use of the words "the right to keep and bear arms *against* shall not be infringed" have been thought to be needed by those drafting the constitution's language? Why not include the preposition "*for*" to solidify the meaning – "the right to keep and bear arms *for* shall not be infringed". Better? No.  Intellectual honesty requires

acknowledgement that "the right to keep and bear arms" cannot be limited by excluding certain historical uses of "bear arms" because of being associated with activity beyond self defense and especially not those historical uses of "bear arms *against*" in relation to the militia, the very militia referenced in the literal text of the prefatory clause of the Second Amendment. The use of "bear arms" does not simply mean "carry arms". In *Aymette v. State*, 21 Tenn. 152 (Tenn. 1840), a court nearer to the time of when the original public meaning was much fresher in mind, opined that "[a] man in the pursuit of deer, elk, and buffaloes might carry [keep on his person] his rifle every day for forty years, and yet it would never be said of him that he had borne arms".

While individual self defense is a key purpose of the right, it is not the sole purpose nor even one of just two purposes. Many intended purposes can be reached by any number of different prepositions. Cleary, the context of protecting a broad right, not unlike free speech, would not require use of a preposition in defining the right would lack of any preposition mean the right is limited. Prepositions . . . do you have a right to keep and bear arms . . .

to demolish manmade structures?

by placing quantities of arms in store for future conflicts?

when hunting animals for food?

in sporting contests like sharpshooting?

during a parade celebrating historic arms?

for self defense?

against militia targets of hostilities?

To exclude purposes often preceded by the preposition "against" is to exclude a subset of the right.

As to the types of arms which may be borne as part of the right, though perhaps dicta in *Simpson v. The State*, 5 Yerg. 356, 360 (1833), that "by this clause in the constitution, an express power is given and secured to all the free citizens in the State to keep and *bear arms* for their defence, *without any qualification whatever as to their kind and nature.*" (emphasis added) still serves to show the original public meaning of the term "keep and bear arms". Truly, "without any qualification whatever as to their kind and nature." would mean whatever "arms" may be used to defend from attack or brought to bear for attacking a target of hostilities, whether the target be a man or a ship, whether the arms are kept about one's person or kept mounted to a wagon or kept moored to a dock in the bay. Thus, any arms whatsoever may be kept and borne bring all arms within the protection of the constitution. Some judges may be affrighted by that balance made by We The People. That is insufficient cause to disregard the duty to uphold it.

*Heller* did not fully determine the broad *original public meaning* of the phrase "to keep and bear arms" which may have been part of the impetus for stating that "we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment".  As a term of art that need not include use of the preposition "against" to render its idiomatic meaning as being much broader

than what *Heller* fleshed out in its less than complete historical analysis of the meaning of "bear arms". *Heller* stated that "[e]very example given by petitioners' *amici* for the idiomatic meaning of "bear arms" from the founding period either includes the preposition "against" or is not clearly idiomatic. See Linguists' Brief 18–23. Without the preposition, "bear arms" normally meant (as it continues to mean today) what Justice Ginsburg's opinion in *Muscarello* said." But this use of "*normally meant*" should be severed from the *less than normal* meaning of phrases used in a legal document designed as a constitution to govern an entire nation of people. Rather, many *normal meanings* can co-exist within the *less than normal meaning* found in the text of the Second Amendment which was intended to set forth a broad right just that the First Amendment set forth broad rights with such brief use of words.

More to the nuts and bolts analysis, which type of analysis can miss the forest because of all the trees, H*eller* first sought to define "arms" and approvingly noted a historical meaning of arms as "weapons of offence, or armour of defence." And concluded the brief few paragraphs by stating that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." It did not define "bearable arms" but did move on to "turn to the phrases "keep arms" and "bear arms." *Id.* While it is not absolutely

clear, the use of "bearable arms" (as a *prima facie* descriptor) was likely intended to be based on the subsequent analysis and identification of the meaning of "bear arms".

*Heller* ultimately settled on, at least, a natural meaning of "to keep and bear arms" which stemmed from a dictionary-centric approach by looking at individual definitions for "keep arms" and "bear arms", and presently leaving out consideration of "to keep and bear arms" as being an effective "term of art" that could encompass a concept far broader than selective definitions of each individual word or component phrase.

Even if staying exclusively with dictionary definitions, a right to "keep" can certainly include to keep about one's person, i.e., to "carry" about one's person". Likewise, with a right to "bear", while in some context, "bear" can mean the same thing as "keep", it also allows of a much more expansive meaning. *Heller* stated that '[a]t the time of the founding, as now, to "bear" meant to "carry."' That much is true, but, at the time of the founding, as now, to "bear" also had a more expansive meaning than just "carry" including a meaning which encompasses that a person can bring a weapon to "bear" on a target of hostilities. And that type of bringing to "bear" can be done without even holding or carrying the weapon, such as a

74

horse drawn wheeled cannon being sighted for hitting a fort or a ship's big guns having its "bearings" set to aim at another vessel, those weapons being able to be aimed by a single individual though not able to be carried upon one's individual person, including a machinegun first developed in 1790. ( See https://www.youtube.com/watch?v=rCuVMx5h1x0 )

The Second Amendment does not have a militia-only meaning but neither does it have a self-defense-only meaning. It covers both militia activity and individual self defense activity as well as many other activities for which arms are used such as hunting and sharpshooter contests. Historically, there was no difference between the "people" and the "militia". Some of the people had cannons and ships which they employed for use in militia activity. Historically, the people owned, and had a right to own, whatsoever weapon was useful or self-defense or for warfare or for any other lawful purposes. In other words, any and all arms (defensive and offensive). See, e.g., a scholarly article at https://www.battlefields.org/learn/articles/militia-sea recounting the use of privately-owned ships hired for service as part of the militia. See also, https://versacarry.com/gun-news/biden-fails-fact-check-on-revolutionary-war-cannon-ownership/ which is a scholarly reply article, finding as false, President Biden's statement that "You weren't allowed to own a cannon during the Revolutionary War as an

individual." Pertinent information includes that local communities chartered

units of cannoneers and that the Founding Fathers never mentioned that

ownership and circulation of artillery be curtailed either during or following

the war. The article also notes that Hamilton wrote in Federalist 29 in

1788 that, "Little more can reasonably be aimed at, with respect to the people at

large, than to have them properly armed and equipped…" and that "military

historians can point to hundreds of locally raised private units that existed at the

time with a myriad of uniforms, arms and, yes, even artillery, of their choosing and

ownership." The article shares the historical information, with commentary, that

> "During that same period, anyone with the desire and extra cash could
> acquire their own cannon. Indeed, as pointed out by Politifact,
> personally-owned ship's cannons were used on American privateers in
> the War of 1812, with more than 500 letters of marque issued by
> President James Madison's administration authorizing such legal
> piracy. Should we mention here that Madison was a Framer of the
> Second Amendment?"

Not until the twentieth century (1903) did Congress began to attempt to dissuade

large private militia units and, even then, the private purchase of artillery was by

no means illegal or even regulated, in the country.

> "Even in 1934, when Congress responded to media-hyped Prohibition
> and Depression-era outlaws such as the Dillenger gang by regulating
> machine guns, suppressors, short-barreled rifles, and short-barreled
> shotguns under the National Firearms Act, they kept artillery pieces
> fully legal and free to own without Uncle Sam getting involved."

It was not until 1968, that the Omnibus Crime Control and Safe Streets Act,

began regulating most destructive devices with a bore over .50-caliber.

> "This meant that modern artillery "such as bazookas,
> mortars, antitank guns, and so forth" were placed
> under ATF restrictions in a kind of retroactive
> addition to the NFA. Before that time, you could buy
> surplus hardware such as working Boys and Lahti
> anti-tank rifles at local outlets, cheap."

*Heller* agreed with a statement of Justice Ginsberg (affectionately RBG) that

> "[s]urely a most familiar meaning is, as the Constitution's Second
> Amendment … indicate[s]: 'wear, bear, or carry … upon the person
> or in the clothing or in a pocket, for the purpose … of being armed
> and ready for offensive or defensive action in a case of conflict
> with another person.' " *Id.*, at 143 (dissenting opinion) (quoting
> Black's Law Dictionary 214 (6th ed. 1998)). We think that
> Justice Ginsburg accurately captured the natural meaning of "bear
> arms."

But the question should not be whether it accurately captured a *natural* meaning of

"bear arms" but rather did it accurately captured the full *original public meaning* of

"bear arms" as used in the term "to keep and bear arms". Limiting the original

public meaning of the right to only encompass "bearable arms" is only historically

accurate *if* the use of  "bearable arms" is in relation to the *original pubic* meaning.

That is, *if* "bearable arms" merely encompasses those arms (i.e., weapons and

armour)  which fall within one certain *natural* meaning, i.e., those arms which can

be lifted and carried by a single individual, as opposed other meanings including

weapons which can be guided, targeted, or aimed by a single individual even

though they cannot be carried by a single individual, *then* such definition of "bearable arms" misses the mark so to speak.

The conclusion in *Heller* concerning "bear arms" was stated as "From our review of founding-era sources, we conclude that this natural meaning was also *the* meaning that "bear arms" had in the 18th century." *Id.*(emphasis added for "the"). Two things, first there are multiple natural meanings for "bear arms" throughout history, including meanings of aiming arms, setting bearings for arms, targeting arms, setting guidance of arms, etc. and thus using the definitive article "the" (i.e. "*the* meaning") rather than using "a" (i.e., "*a* meaning") was an artificial limitation. Second, these still speak to "natural" meanings rather than the "original public meaning" which could encompass any or all of the various different natural meanings.

In conclusion, all arms (armaments of offense and defense) are *prima facie* protected by the Second Amendment's protection of the right to keep and bear arms as to *mere possession* but the manner and keeping an bearing arms may be reasonably regulated civilly for safety that would pose *imminent harm* such as large stores of gunpowder, and may be regulated criminally for manners of keeping and bearing arms which terrorize others, that is, *conduct* maybe regulated such as brandishing or engaging in an affray.

*WMDs*

It may be objected that protection of all "dangerous and unusual weapons" would mean that weapons of mass destruction (WMDs) could be in the hands of any person and pose a great risk. While true that WMDs cannot be banned, *conduct* concerning their storage and use can be reasonably regulated. There were a number of historical regulations on conduct in relation to arms which could readily cause mass destruction such as the following:

> * Pennsylvania: 1750 An Act For The More Effectual Preventing Accidents Which May Happen By Fire . . . That if any persons or persons whatsoever, within any county town, or within any other town or borough, in this province, already built and settled, or hereafter to be built and settled . .. shall fire any gun or other fire-arm, or shall make or cause to be made, or sell or utter, or offer or expose for sale, any squibs, rockets or other fire-works, within any of the said towns or boroughs without the governors special license for the same, every such person or persons, so offending shall be subject to the like penalties and forfeitures . . .

> * Massachusetts: 1785 That no person (excepting the militia, when under arms, on muster-days, and by the command of their officer) shall fire off any sort of gun, pistol or other thing charged or composed in whole, or in part of gun-powder, in array of the streets, lanes or public ways in this town

> * Delaware: 1812 An Act To Prevent The Discharging Of Fire Arms Within The Towns And Villages, And Other Public Places Within This State if any person or persons shall presume to fire or discharge any gun, ordinance, musket, fowling-piece, fuse or pistol, within any of the towns or villages of this State, or within the limits thereof, or where the limits cannot be ascertained, within one quarter of a mile of the centre of such town or

village, shall fire or discharge any gun, ordinance, musket, fowling piece, fuse or pistol, within or on any of the greens, streets, alleys or lanes of any of the towns and villages within this State, whereon any buildings are or shall be erected.

* New Hampshire: 1823 That if any person or persons shall within the compact part of the town of Portsmouth, that is to say within one mile of the courthouse, fire or discharge any cannon, gun, pistol or other fire arms, or beat any drum . . . or fire or discharge any rockets, squibs, crackers, or any preparation of gunpowder. . . for every such act shall be taken and deemed to be an offender against the police of Portsmouth, and shall be liable to the penalties hereinafter expressed.

These historical "black powder" laws point toward regulating manners of conduct (the how) for protecting (the why) the people from mass death and destruction which can be readily caused by the particular conduct or use of certain arms, such as centralized storage of large amounts of black powder or by firing open flame weapons (e.g. flintlocks) near to populated areas where inadvertent fire could spread quickly and cause mass death and destruction. These historical laws are analogous to today's regulation of radioactive nuclear materials such as uranium and plutonium based weapons, that is, regulation of manners of conduct relating to specific arms (how) for the protection of the people against mass death and destruction(why). Many of today's WMD's are possessed privately, even manufactured privately for sale to and use by the government. Such private possession and manufacture cannot be prohibited, but the arms can be reasonably regulated even if the regulations effectively place such weapons beyond

feasible possession by most people.

For the present case involving firearms which can be lifted and carried by a single individual, it should be found that the restriction is a *prima facie* infringement upon CLARK's own individual right to keep and bear arms protected by the Second Amendment, such that the burden then falls on defendant(s) to make the necessary showing that the NICS background requirement, as applied to CLARK, is consistent with this Nation's historical tradition of firearm regulation.

*DE MINIMUS VIOLATION OF A FUNDAMENTAL RIGHT*

The Court should not engage in balancing the effects on CLARK to determine if a violation of the right to keep and bear arms was *de minimus* or not. What about CLARK's right to free speech? What if CLARK wanted to speak at a city council meeting that allows public input and CLARK had properly followed the process to sign up to speak for the three allotted minutes like other members of the public did at the same meeting, but as CLARK approached the podium, the mayor says "I see this is your first time here to speak so please sit back down or else we'll have the sheriff remove you". No violation of CLARK's right because it was *de minimus* in effect, only disallowed CLARK's protected speech for three minutes? What about CLARK's right to counsel? Could CLARK be

deprived of counsel during the two minute colloquy of entering a guilty plea?

What about CLARK's right to a public jury trial? Could the court deem the facts

were so overwhelming that the judge is justified in entering a directed verdict of

guilt? What about CLARK's due process right for deprivation of life, liberty or

property? Can an officer arrest CLARK because he has a hunch that CLARK is

guilty of something? Finally, what about CLARK's right of self-defense and right

to keep and bear arms? What if CLARK was shot and killed because his purchase

of a firearm was delayed for three days? What if CLARK was NOT shot and killed

because his purchase of a firearm was delayed for three days? Does the Second

Amendment require balancing those effects to determine if the right was violated?

    While it should not matter to the analysis, within the recent past (inside of

the last 10 years) CLARK has had a number of separate vandalisms at his house

for which the perpetrator(s) are unknown including acts of fire bombing a trailer

(wood platform on steel frame - burned so much that it melted the tires) parked

near the road at the end of a driveway, black spray painted "Dead" on a white

welcome sign with red lettering near the road, spray painted KKK and swastika

symbol on the road in front of CLARK's house (no neighbors for 100 yards in

either direction), spray painted huge F.U. on side of the bed of CLARK's 1971

GMC pickup truck, ran over and destroyed a large "support our troops" sign near

the mail box by the road and a the welcome sign was run over and destroyed. Does

CLARK have to show good cause to fall within the protection of the Second

Amendment's protection? Does CLARK have to show that the delay in exercising

his right actually caused some harm or injury to his person or property?

For a responsible law-abiding citizen, for whom the requisite protection of

constitutionally protect due process rights, including a meaningful opportunity to

be heard, have not been afforded to authorize deprivation of any enumerated

fundamental constitutional right: 1) what if that citizen is restricted under color of

law from giving his or her opinion in a public meeting for three minutes and

2) what if that citizen is restricted under color of law from defending his or her life

with a firearm in public for three minutes : which of these violations of enumerated

fundamental rights should be considered *de minimus* and why?

At end, as can be seen in examples above, any *de minimus* determination

necessarily requires the court to weigh how much of a right is valuable enough to

protect which is nothing more than a judicially initiated balancing test and not the

balance applied by the people through enactment of a "shall not be infringed"

clause in the Second Amendment. Such judicially administered balancing tests can

be prone to causing "death by a thousand cuts" without the court even intending

that outcome. A similar consideration can be seen in the 1822 Kentucky case of

*Bliss* where that court plainly rejected the slippery slope that necessarily inheres

when initiating any incremental incursion on what might otherwise be a fully protected fundamental right.

### UNCONSTITUTIONAL IMPLEMENTATION OF NICS BY REQUIRING ANSWERS TO INCRIMINATORY QUESTIONS

The statutory authority for implementing NICS background checks does not extend to authorizing the requiring of answers to incriminatory questions in order for a citizen to exercise the enumerated fundamental right to keep and bear arms protected by the Second Amendment. Implementation of the newly revised Form 4473 should be reviewed under the rubric of the First Amendment right concerning "compelled speech" and under the Fifth Amendment right of protection against self incrimination (colloquially known as the right to remain silent).

This challenge is two pronged – *firearms* and *ammunition*.  Even if the implementation is permissible for *firearms*, it should be separately analyzed under the Second Amendment claim in regard to *ammunition*.

There is no proper historical analogue of requiring a background check for purchase or transfer of *firearms* or *ammunition*, yet the NICS background check requirement has been applied (beginning April 1, 2023) to *ammunition* in addition to *firearms*. See a description of the latest changes for enforcement of NICS at https://www.atf.gov/firearms/atf-form-4473-firearms-transaction-record-revisions The information at this web address mentions "new statutory requirements are designed to enhance public safety" and that the revised Form 4473 became

mandatory for use on April 1, 2023.  Form 4473 serves as part of the

implementation of the NICS background requirement set for in 18 U.S.C. §

922(t). Questions 21(b) and 21(c) of the newly revised Form 4473 asks potentially

incriminating questions which are implicitly (and with coercive attributes) required

to be answered before an FFL will allow a purchase.

First, to clear the smoke concerning "new statutory requirements are

designed to enhance public safety", that a new statutory requirement makes

it unlawful to transfer firearms or ammunition to people reasonably believed to be

prohibited persons DOES NOT require implementation of a question within the

implementation of NICS. The form does not ask if you intend to dispose of the

firearm or ammunition to a person who you reasonable believe wants to use it to

threaten federal judges or burglarize a prosecutor' house . Why are there not many

more of these incriminatory type of questions added to the background check?

QUESTION 21.b. asks "Do you intend to purchase or acquire any firearm

listed on this form and any continuation sheet(s), *or ammunition*, for sale or other

disposition to any person described in questions 21(c)-(m), or to a person described

in question 21.n.1 who does not fall within a nonimmigrant alien exception?"

(emphasis added).

See copy of the revised Form 4473 at https://www.atf.gov/firearms/docs/4473

-part-1-firearms-transaction-record-over-counter-atf-form-53009/download

( A copy also attached as Exhibit J )

The ATF at the web address above, stated that "To clarify: Question 21b is asking the transferee (customer) if they intend to sell or distribute any of the firearms, they are acquiring, to a person prohibited from receiving or possessing firearms" which makes clear that the incriminating question is asked of the person seeking to purchase or transfer a firearm or ammunition.

Question 21.c. asks "Do you intend to sell or otherwise dispose of any firearm listed on this form and any continuation sheet(s) *or ammunition* in furtherance of any felony or other offense punishable by imprisonment for a term of more than one year, a Federal crime of terrorism, or a drug trafficking offense?" (emphasis added)

Questions 21(b) and 21(c) are identified at the web address above as "Two new **prohibiting questions** added to Section B" (emphasis added) and the "NOTICES, INSTRUCTIONS, AND DEFINITIONS" section of the newly revised Form 4473 do not  mention 21(b) or 21(c). And a purchaser, or transferor, is required to "certify that: (1) I have read and understand the Notices, Instructions, and Definitions on this ATF Form 4473".

Part of the Instructions to the FFL (i.e., licensee) is:

'The licensee should NOT contact NICS and must stop the transaction
if there is reasonable cause to believe that the sale or disposition of a
firearm to the transferee/buyer is prohibited or the transferee/buyer is
prohibited from receiving or possessing a firearm, including if: the
transferee/buyer answered "no" to questions 21.a; the transferee/buyer
answered "yes" to questions 21.b. – 21.m; the transferee/buyer
answered "yes" to question 21.m.1., and answered "no" to question
21.m.2.'

This implementation of questions has a clearly foreseeable coerced result of FFL's

requiring the person seeking to purchase or transfer ammunition to answer those

questions because of the form being implemented under color of law, and thus,

being the proximate cause of denying a purchase or transfer if those incriminating

questions are not expressly answered in the negative. This coercive result will be

so because of the instructions that: "Any person who transfers a firearm to any

person knowing or having reasonable cause to believe the sale or disposition to

such person is prohibited violates the law, 18 U.S.C. 922(d), even if the

transferor/seller has complied with the Federal background check requirements."

would place an FFL in the position of being a potential accomplice(aid or abet) to a

potential crime.

18 U.S.C. § 922(a) "It shall be unlawful —"

"for any person in connection with the acquisition or attempted acquisition
of any firearm *or ammunition* from a licensed importer, licensed
manufacturer, licensed dealer, or licensed collector, knowingly to make any
false or fictitious oral or written statement or to furnish or exhibit any false,
fictitious, or misrepresented identification, intended or likely to deceive such
importer, manufacturer, dealer, or collector with respect to any fact material

to the lawfulness of the sale or other disposition of such firearm or
ammunition under the provisions of this chapter;"

18 U.S.C. § 922(a)(6) (emphasis added)

18 U.S.C. § 922(d) "It shall be unlawful for any person to sell or otherwise dispose
of any firearm or ammunition to any person knowing or having reasonable cause to
believe that such person, including as a juvenile—"

"(10) intends to sell or otherwise dispose of the firearm *or
ammunition* in furtherance of a felony, a Federal crime of terrorism, or
a drug trafficking offense (as such terms are defined in section
932(a)); or
(11) intends to sell or otherwise dispose of the firearm *or ammunition*
to a person described in any of paragraphs (1) through (10)."

18 U.S.C. § 922(d)(10-11) (emphasis added)

The ATF has no statutory authority to restrict the purchase or transfer of firearms

or ammunition by requiring an answer (compelling speech) to incriminatory type

of questions asked under color of law. Such implementation NICS using

incriminatory questions asked through the medium of a form which is required to

be used by FFLs for purchase or transfer of ammunition is plainly an attempt to

accomplish indirectly what the government is prohibited from doing directly.

Even if a non-answer to questions 21(b) and/or 21(c) would not strictly

prohibit (black letter law) the sale or transfer of ammunition by an FFL, the

strong semblance of a requirement "under color of law" should be found to be

sufficient infringement on the right protected by the Second Amendment to enjoin

use of those questions. On April 5, 2023, prior to attempting to purchase a firearm,

when asked about this, the FFL indicated that unless Questions 21(b) and 21(c) were answered in a particular way, then the FFL would not conduct the NICS background check or sell any firearm.

*18 U.S.C. § 922(g)(3) AND OTHER INCRIMINATING QUESTIONS*

Apart from Questions 21(b) and 21(c) above, the Form 4473 has long asked (i.e., prior to the latest revision) a potentially incriminating question about "**marijuana**" or "any other controlled substance". See **Question 21(g)** of the recently revised Form 4473. The court may take judicial notice that the "War on Drugs" of former President Richard ("Dick") Milhous Nixon which was used to criminalize marijuana was undeniably racist and ideological. The political insiders of the Nixon Administration wanted to squelch blacks and the "pot heads" of all races ("hippies") who were anti-war. This was blatantly admitted by John Ehrlichman (top white house aid of President Nixon) according to a publication by CNN (Cable News Network) about 7 years ago. See https://www.cnn.com/2016/03/23/politics/john-ehrlichman-richard-nixon-drug-war-blacks-hippie/index.html

> "You understand what I'm saying? We knew we couldn't make it illegal to be either against the war or black, but by getting the public to associate the hippies with marijuana and blacks with heroin. And then criminalizing both heavily, we could disrupt those communities," Ehrlichman said. "We could arrest their leaders, raid their homes, break up their meetings, and vilify them night after night on the

evening news. Did we know we were lying about the drugs? Of course we did."

On Feb. 2, 2023, in *United States v. Rahimi*, Appeal No. 21-11001 (Fifth Circuit) the court declared, as unconstitutional, a federal law prohibition on owning firearms for people under domestic violence restraining orders (18 U.S.C. § 922(g)(8)). That decision is on appeal to the Supreme Court of the United States as docket No. 22-915 with a QUESTION PRESENTED: Whether 18 U.S.C. 922(g)(8), which prohibits the possession of firearms by persons subject to domestic violence restraining orders, violates the Second Amendment on its face.

On Feb. 3, 2023, the United States District Court for the Western District of Oklahoma, in *United States v. Harrison*, Case No. CR-22-00328-PRW, issued an Order(Dkt. 36) granting a motion to dismiss(Dkt. 17) with prejudice on grounds that 18 U.S.C. § 922(g)(3) is unconstitutional and declining to reach vagueness claim (being unnecessary).

On April 6, 2023, the United States District Court for the Western District of Texas, in *United States v. Connelly*, Case No. 3:22-cr-00229-KC, issued an Order(Dkt. 101) stating that "§ 922(d)(3) does not withstand Second Amendment scrutiny for much the same reasons that § 922(g)(3) does not."

*18 U.S.C. § 922(n)*

On Sep. 19, 2022, the court in United States v. Quiroz, Case No. 22-CR-

90

00104-DC (W.D. Tex.), found that 18 U.S.C. § 922(n), a statute prohibiting

persons under felony indictment from receiving a firearm, is not consistent

with this Nation's historical tradition of firearm regulation and, thus, violates

the Second Amendment.  That case is currently on appeal to the Fifth Circuit Court

of Appeals as Docket #: 22-50834.  On February 8, 2023, the Fifth Circuit heard

oral argument and then requested additional briefing which is currently allowed to

be filed up until April 24, 2023.

In the supplemental brief filed by the United States in April 10, 2023, the

historical regulations (laws and caselaw) offered in support of upholding the statute

primarily relied on the Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 91 in which the

First Congress granted criminal defendants an absolute right to bail in non-capital

cases, but made bail discretionary "where the punishment may be death." Several

cases cited to the proposition that such as noting that "Bail is never allowed in

offences punishable by death, when the proof is evident or the presumption great".

That history would certainly support holding some capital offence defendants

without bail but does not speak to those defendants for which discretionary bail

was permitted.

The briefing of the United States does note that "A defendant seeking release

on bail had to find "sureties"—that is, friends, neighbors, or other third parties who

were willing to guarantee his attendance at trial and his good behavior in the

meantime. See 3 William Blackstone, Commentaries on the Laws of England 290

(1765)." but canvassing for, and posting of, sureties for release before trial is not a

restriction on liberty. *Bruen* contained some discussion about "*Surety Statutes*".

> "the surety statutes *presumed* that individuals had a right to public
> carry that could be burdened only if another could make out a specific
> showing of "reasonable cause to fear an injury, or breach of the
> peace." Mass. Rev. Stat., ch. 134, §16 (1836). [24] As William Rawle
> explained in an influential treatise, an individual's carrying of arms
> was "sufficient cause to require him to give surety of the peace" only
> when "attended with circumstances giving just reason to fear that he
> purposes to make an unlawful use of them." A View of the
> Constitution of the United States of America 126 (2d ed. 1829). Then,
> even on such a showing, the surety laws did not *prohibit* public carry
> in locations frequented by the general community. Rather, an accused
> arms-bearer "could goon carrying without criminal penalty" so long
> as he "post[ed] money that would be forfeited if he breached the peace
> or injured others—a requirement from which he was exempt if *he*
> needed self-defense." *Wrenn*, 864 F. 3d, at 661.' *Id.*

The brief of the United States also offered that a restriction on the right to

keep and bear arms for a pretrial detainee out on bond "reduces the risk that

criminal defendants will use firearms to facilitate their flight, and it helps ensure

that indicted criminal defendants do not use firearms to commit other crimes while

awaiting trial." and argued that "The "burden[s]" imposed by Section 922(n) are

also "comparable"". While those may be noble policy aims for imposing such a

burden, the burden is actually far greater than the historical surety laws, that is, not

comparable burdens, as noted in *Bruen*. The government may certainly deny bail to

reach those policy objectives with the proper specific justifications for denying

bail, but once discretion is exercised to release a defendant on bail, that effectively

demonstrates that the person released is not a significant risk to act contrary to

those policy goals. Regardless of such noble policy aims, the Second Amendment

takes some policy choices off the table.

This mention of 18 U.S.C. § 922(n) is to show that the restriction on the

right to keep and bear arms based on admitting to being an unlawful marijuana

user, which is not a capital crime punishable by death nor even a felony for first

violation of, falls far below the constitutional permissibility of someone actually

under a felony indictment. Criminal penalties for a first conviction under 21 U.S.C.

§ 844 (possession of marijuana) allows for imposing a sentence of up to a term of

imprisonment of not more than 1 year, and a minimum fine of $0.00, or both.

If  18 U.S.C. § 922(n) is unconstitutional, it would be mysterious as to how

18 U.S.C. § 922(g)(3) would not also be unconstitutional.

*18 U.S.C. § 922(k)*

But for the existence of 18 U.S.C. § 922(k), CLARK would restore a rusty

firearm that can be purchased outside of CLARK's State of residence that will

require CLARK to remove or alter or obliterate the rusty firearm's manufacturer's

serial number in order to safely use the firearm for the purpose of self defense in

his home. CLARK has done similar restoration work in the past but, without

revealing the details of the past conduct, seeks to do so similarly again.

The conduct prohibited by 18 U.S.C. § 922(k) falls squarely within the

Second Amendment's plain text. Firearms without identification marks were

certainly not considered dangerous or unusual compared to other firearms because

identifying marks were not required or even commonly used anywhere near to the

time of the ratification of the Second Amendment. This court would not be the first

court to rule this type of restriction impermissible under the right to keep and bear

arms. See, e.g., federal court decision in the Southern District of the United States

District Court for West Virginia case No. 2:22-cr-00097 Opinion and Order issued

October 12, 2022 which contained in pertinent part:

> "The burden falls on the Government to "affirmatively prove that its
> firearms regulation is part of the [or analogous to a] historical
> tradition that delimits the outer bounds of the right to keep and bear
> arms." *Id.* at 2127. The Government has not done so here, and I have
> no choice but to find 18 U.S.C. § 922(k) unconstitutional." *Id.*

*RELIEF CONSIDERATIONS*

If enforcement of the challenged statutory provisions are unconstitutional as

applied to CLARK, then they must be enjoined in their entirety because enjoining

in regard to CLARK alone would necessarily entail improperly keeping a

registration of which citizens are permitted to obtain a firearms and the use of

such means (HOW) was not the historical means employed to address the societal

problem of violence committed with firearms(WHY). Beyond that, such

registration lists would be prone to becoming inaccurate as there is no reasonably

effective way conceivable to maintain such a list without intruding into

other protected interests of the citizenry. Lastly, as pertaining to the regulations,

CLARK is similarly situated in all relevant aspects to all other law abiding

responsible citizens and making CLARK's personal identifying information to be

accessible by all FFLs in order to ensure they know CLARK is permitted to obtain

firearms would be an invasion of CLARK's reasonable expectation of privacy.

## *DEMAND FOR JURY TRIAL*

CLARK demands respect of his right to a trial by jury on the facts so triable.

## *DESIGNATION OF PLACE OF TRIAL*

CLARK designates Kansas City as the location for trial in this matter.

Respectfully submitted,


Eric S. Clark
1430 Dane Avenue
Williamsburg, Kansas 66095
785-214-8904
eric@whitestonepublishing.org

95