# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ERIC S. CLARK,               )
                                   )
               Plaintiff,        )
                                   )
     vs.                     )      Case No. 23-2170-JAR-RES
                                   )
MERRICK GARLAND,       )
in his official and personal capacity   )
as U.S. Attorney General, *et. al.*    )
                                   )
             Defendants.   )

## DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

COMES NOW the Defendants, by and through their counsel Kate E. Brubacher, United States United Attorney for the District of Kansas, and Terra D. Morehead, Assistant United States Attorney, and respectfully move this Honorable Court to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12 (b)(6), as the Court is without jurisdiction and because the Complaint fails to state a claim upon which relief may be granted, because even accepting all of Plaintiff's factual allegations as true, binding precedent does not support Clark's position.

## INTRODUCTION

Plaintiff Eric S. Clark filed his Civil Complaint (Doc. 1) asserting a multitude of claims: (1) The National Instant Criminal Background Check System (NICS) has repeatedly and improperly denied or delayed Plaintiff's ability to purchase firearms, violating his Second Amendment and Due Process rights; Plaintiff also makes a *Bivens* claim under the same facts[1]; (2)

---

[1] Claims under *Bivens*, are limited to those arising under the Fourth Amendment's Unreasonable Search and Seizure Clause, the Fifth Amendment's Due Process Clause, and the

The Gun Control Act (GCA) is broadly unconstitutional under the Second Amendment, but specifically as to 18 U.S.C. § 922(t); (3) ATF Form 4473, which requires responses to a series of questions prior to the transfer of a firearm, violates Plaintiff's Fifth Amendment right against compelled self-incrimination; (4) 18 U.S.C. § 922(g)(3) is specifically unlawful because it does not have a close historical analogue as required under *Bruen*; and, (5) 18 U.S.C. § 922(k) is specifically unlawful because it also does not have a close historical analogue as required under *Bruen*.

## BACKGROUND

### A.  Legal and Regulatory Background of the Gun Control Act

The Gun Control Act of 1968 (GCA), as amended, 18 U.S.C. §§ 921 et seq., was enacted in part as a reaction to the assassinations of President John F. Kennedy, Senator Robert F. Kennedy, Dr. Martin Luther King, Jr., and Medgar Evers. *United States v. Melville*, 309 F. Supp. 774, 776 (S.D.N.Y. 1970). The purpose of the GCA was "to amend existing Federal firearms control law to (1) regulate more effectively interstate commerce in firearms so as to reduce the likelihood that

---

Eighth Amendment's Cruel and Unusual Punishments Clause. *Ziglar v. Abbasi*, 582 U.S. 120, 130 (2017). No Court has ever extended *Bivens* to claims under the Second Amendment, as Plaintiff seeks to do now. (Doc. 1, at 5.)  *Bivens* claims are also limited to monetary damages. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). However, Plaintiff seeks "an injunction" and "further equitable relief" in addition to monetary damages. (*Id.*)  It appears Clark has attempted to posture his Complaint in hopes of getting monetary damages herein, which could only be possible under a *Bivens* claim, hence the reference to UGA #1-UGA #6.  To the extent plaintiff alleges a claim under *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), against defendant in his individual capacity, rather than his official capacity as United States Attorney General, the court finds that such claim would be subject to dismissal for failure to state a claim upon which relief can be granted. *Bivens* liability has not been extended to a claim under Second Amendment. *See Meeks v. Larsen*, 611 Fed. Appx. 277, 286 (2d Cir. 2015); *Yorzinski v. Imbert*, 39 F. Supp. 3d 218, 223 (D. Conn. 2014). In addition, a *Bivens* action does not allow for a plaintiff to seek equitable relief. *See Bivens*, 403 U.S. at 410 (Harlan, J. concurring ("For people in *Bivens*' shoes, it is damages or nothing."); *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) ("The only remedy available in a *Bivens* action is an award for monetary damages from defendants in their individual capacities.").

they fall into the hands of the lawless or those who might misuse them; (2) assist the States and their political subdivisions to enforce their firearms control laws and ordinances; and (3) help combat the skyrocketing increases in the incidence of serious crime in the United States." S. Rep. No. 1866, 89th Cong., 2d Sess. 1 (1966). Licensing provisions were enacted to strengthen Federal controls over interstate and foreign commerce in firearms to better assist State regulation of firearms traffic within State borders. *Melville*, 309 F. Supp. at 776. Recordkeeping requirements provide "identifying information about gun purchasers and the firearms they purchase, which allow firearms to be traced and prevents transfer to persons prohibited from possessing" them. *Article II Gun Shop, Inc. v. Gonzales*, 441 F.3d 492, 494 (7th Cir. 2006). Marking requirements, particularly serial numbers, allow for the "direct tracing of the chain of custody of firearms involved in crimes . . . , provide[] agencies with vital criminology statistics—including a detailed picture of the geographical source areas for firearms trafficking and 'time-to-crime' statistics which measure the time between a firearm's initial retail sale and its recovery in a crime—as well as allowing for the identification of individual dealers involved in the trafficking of firearms and the matching of ballistics data with recovered firearms." *United States v. Marzzarella*, 614 F.3d 85, 100 (3d Cir. 2010).

The GCA further updated earlier federal firearms laws by "expand[ing] the categories of persons prohibited from receiving firearms." *Barrett v. United States*, 423 U.S. 212, 220 (1976). Section 922(g) prohibits certain groups from possessing or transporting any firearm with a nexus to interstate commerce. 18 U.S.C. § 922(g). "Congress' intent in enacting §[] 922(g) . . . was to keep firearms out of the hands of presumptively risky people." *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 112 n.6 (1983).

3

Section 922(g)(3) prohibits an "unlawful user[s] of . . . any controlled substance" as defined in the Controlled Substances Act (CSA), from possessing firearms. Marijuana is a controlled substance, and all marijuana possession (except for approved research purposes) violates federal law, despite any state laws providing to the contrary. Section 922(d) prohibits transferring firearms to someone that the transferor knows or has reason to believe falls within one of the categories of 922(g), including unlawful drug users. See 18 U.S.C. § 922(d)(3). Therefore, Section 922(g)(3) prohibits marijuana users from possessing firearms, and Section 922(d)(3) prohibits any person from selling firearms to known or suspected marijuana users.

Significantly, licensed dealers, or Federal Firearms Licensees (FFLs), may not sell or otherwise dispose of any firearm to an unlicensed person without completing ATF Form 4473, Firearms Transaction Record. 27 C.F.R. § 478.124. Form 4473 indicates the purchaser's name, date and place of birth, gender, height, weight, race, residence address, country of citizenship, and certifies that the purchaser is not a prohibited person under the GCA (18 U.S.C. § 922(g)). *Id.* § 478.124(c). Prior to making any over-the-counter firearms transaction, the FFL must verify the purchaser's identity and conduct a background check through the NICS. 18 U.S.C. § 922(t); *id.* §§ 478.102, 478.124(c).

Licensed importers and manufacturers must identify each firearm imported or manufactured by the FFL by means of a serial number engraved, stamped, or cast on the receiver or frame of the weapon. 18 U.S.C. § 923(i). These FFLs are also required to mark the specific model of the firearm, caliber or gauge, the FFL's name or abbreviation, and the FFL's geographic location – i.e., the city and state of the licensed premises. 27 C.F.R. § 478.92(a)(1).

In 1993, Congress enacted the Brady Handgun Violence Prevention Act ("Brady Act"), Pub. L. No. 103-159, 107 Stat. 1536, to amend the Gun Control Act. Seeking to prevent the

transfer of firearms to those prohibited from possessing them, H.R. Rep. No. 103-344 (1993), as reprinted in 1993 U.S.C.C.A.N. 1984, 1984–88, the Brady Act required individuals attempting to purchase a firearm from a federally licensed dealer or manufacturer (hereinafter "federal firearms licensee" or "FFL") to undergo a criminal background check, 18 U.S.C. § 922(t). To facilitate compliance with this requirement, the Brady Act directed the Attorney General to establish and operate a nationwide criminal background check system that FFLs would be required to consult to determine whether a prospective purchaser is prohibited from possessing a firearm under federal or state law. 18 U.S.C. § 922(t)(1), (t)(2). Soon after the Brady Act's passage, the Attorney General established the National Instant Criminal Background Check System, or the "NICS", 28 C.F.R. §§ 25.1–25.11, and assigned management of the NICS to the FBI, id. § 25.3.

Under the Attorney General's regulations governing the NICS, the transfer of a firearm from an FFL generally proceeds in three phases. First, an FFL collects the prospective purchaser's name and certain other identifying information (e.g., sex, date of birth, residence address) and submits it to the NICS. 27 C.F.R. § 478.124(c)(1), (2); 28 C.F.R. § 25.7(a). An examiner with the NICS Operation Center then uses this information to perform a background check to determine, based on the information available to the NICS, whether the prospective purchaser is prohibited from possessing a firearm under federal or state law. See 18 U.S.C. § 922(t)(2); 28 C.F.R. § 25.1. The background check involves a search of three national databases: (i) the National Crime Identification Center ("NCIC"), which contains records on wanted persons, protection orders, and other persons identified as relevant to NICS searches; (ii) the Interstate Identification Index ("III"), which contains criminal-history records; and (iii) the NICS Index, which contains information on prohibited persons, as defined under either federal or state law. See 28 C.F.R. § 25.6(c)(1)(iii), (f).

After performing a background check, the NICS sends the FFL one of three responses:

- Proceed. If the background check reveals no prohibitive or potentially prohibitive

5

information regarding the prospective purchaser, the NICS will send a "proceed" response, in which case the FFL may transfer the firearm, unless applicable state law requires that the transaction be delayed. 28 C.F.R. § 25.6(c)(1)(iv)(A).

- Denied. If the background check unveils information demonstrating that either state or federal law prohibits the prospective purchaser from receiving a firearm, the NICS will send a "denied" response, thus barring the FFL from transferring the firearm. *Id.* § 25.6(c)(1)(iv)(C).

- Delayed. If the background check finds a "potentially prohibitive" record requiring more research to determine whether the prospective purchaser is, in fact, prohibited from possessing a firearm, the NICS will send a "delayed" response. Id. §§ 25.2, 25.6(c)(1)(iv)(B). An FFL that receives a "delayed" response from the NICS may complete the transfer once (i) the NICS sends a follow-up "proceed" response, or (ii) three business days have elapsed since the FFL received the "delayed" response—whichever occurs first. Id. The FFL also must comply with any minimum waiting period required under state law.

A prospective purchaser whose firearm transaction is "denied" by the NICS may pursue several administrative remedies. He or she may (i) apply to the FBI (or a point-of-contact state or local agency ("POC"), *see id.* § 25.2) to request the reasons for the denial, *id.* § 25.10(a), (b); (ii) appeal to the FBI or a POC to challenge the accuracy of the record upon which the denial was based, *id.* § 25.10(c), (d); and/or (iii) appeal to the FBI or a POC to attempt to demonstrate that his or her rights to possess a firearm have been restored, *id.* § 25.10(c).[2] An individual whose transaction has been "denied" or "delayed" or who has not yet attempted to purchase a firearm may also submit an application to the FBI to allow it to maintain information about the individual—*e.g.*, information that nullifies prohibitive or potentially prohibitive information in the individual's criminal record—in a "Voluntary Appeal File" ("VAF") for the purpose of preventing future erroneous denials or extended delays of firearm transactions. *Id.* § 25.10(g). If the FBI

---

[2] If a prospective purchaser's "appeal is successful and more than [30] days have transpired since the initial" NICS background check, "the FFL must recheck the NICS before" transferring the firearm. 28 C.F.R. § 25.10(e).

approves an individual's VAF application, he or she will receive a "unique personal identification number" ("UPIN") to use in future transactions requiring a NICS background check.[3]

The Gun Control Act also provides a narrow cause of action for prospective purchasers who have had a firearm transaction denied. Under 18 U.S.C. § 925A, "any person denied a firearm pursuant to subsection (s) or (t) of section 922" who is not, in fact, prohibited from possessing a firearm, or whose denial was based on "the provision of erroneous information" by NICS or a POC, may bring an action against the United States or a POC "for an order directing that the erroneous information be corrected or that the transfer be approved." The plaintiff is not seeking this cause of action, as clearly it does not apply to him.

### B.  Factual Background

In 2003, Eric Clark was convicted of a felony - "involuntary manslaughter-DUI" - in Kansas and briefly imprisoned. (*Clark v. Lynch*, 16-4037-SAC, Doc. 22, at 2.) Plaintiff was released on May 4, 2003. (*Id.*) His rights were restored some 10 years later – May 5, 2013. (*Id.* at 3.) Plaintiff has attempted to purchase firearms on multiple prior occasions, including in 2016, which resulted in his prior Second Amendment Complaint. (*Id.*)

The Plaintiff's prior litigation resulted in a dismissal because the Court lacked jurisdiction because defendant had sovereign immunity against the claims as alleged, and because plaintiff did not have standing. (*Id.* at 11.) During that litigation defendant filed a responsive Memorandum in support of a Motion to Dismiss, along with an accompanying affidavit from a representative from the FBI NICS branch. (*Id.* Doc. 19, 19-1.) The affidavit outlined that the NICS Section offers the Voluntary Appeal File (VAF) as an option for individuals to request that NICS retain

---

[3]*See* Federal Bureau of Investigation, Firearm-Related Challenge (Appeal) and Voluntary Appeal File (VAF) (last visited April 25, 2022), https://www.fbi.gov/services/cjis/nics/national-instantcriminal-background-check-system-nics-appeals-vaf.

information to prevent future extended delays or erroneous denials in their attempts to possess or receive a firearm, and further suggested that Clark make an application for such a procedure to be processed for future firearm applications.  (*Id.* 19-1, at 2.)  Apparently, Plaintiff never availed himself of that offer to avoid future issues.

Over the past several years, Plaintiff has attempted the purchase of firearms on numerous occasions.  (Attachment A – Affidavit of Brian Allen Barker, NICS Representative, at 3.) Although several of Plaintiff's applications have met with a "denied," on a number of those occasions, he failed to follow through with the requisite appeal process; on another occasion he did appeal and the "denied" transaction was overturned and placed into a "proceed" status; and, on the five most recent occasions, the transactions proceeded within 24 hours of his application. (*Id.*)  The attached NICS affidavit again advises Plaintiff of the VAF process, so as to avoid any delays.  (*Id.*)

### Legal Standards and Other Applicable Law

#### A.  Lack of Subject Matter Jurisdiction – Fed. R. Civ. P. 12(b)(1).

At issue in a motion to dismiss a complaint, pursuant to Rule 12(b)(1) is the Court's jurisdiction—its very power to hear the case. *See Robinson v. Dalton*, 107 F.3d 1018, 1021 (3d Cir. 1997). Because its jurisdiction is in dispute, the Court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* In a Rule 12(b)(1) motion, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* Plaintiff bears the burden of proving that jurisdiction exists. *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884 (3d Cir. 1977).

Motions to dismiss for lack of subject matter jurisdiction take two forms: a facial attack or

a factual attack. *Holt v. U.S.*, 46 F.3d 1000, 1002 (10th Cir. 1995). A facial attack questions the sufficiency of the complaint, and the Court must accept the well-pleaded allegations as true. *Id.* In contrast, a factual attack "may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends." *Id.* at *1003. When reviewing a factual attack, the Court "may not presume the truthfulness of the complaint's factual allegations." *Id.* The Court "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under." *Id.* Consideration of evidence outside the pleadings does not convert the motion to a summary judgment motion. *Id.*

### B. Failure to State a Claim upon which Relief May be Granted – Fed. R. Civ. P. 12(b)(6).

In reviewing a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations in the complaint and views the allegations in the light most favorable to the plaintiff. *Smith v. United States,* 561 F.3d 1090, 1098 (10th Cir. 2009). However, to survive a Rule 12(b)(6) motion to dismiss, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The court must disregard legal conclusions, as well as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents to which the complaint refers if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity. *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941–42 (10th Cir.2002). If, however, a document is not incorporated by reference or attached to the complaint, but is referred to in the complaint and is central to the plaintiff's claim, the defendant may submit an

"indisputably authentic copy to the court to be considered on a motion to dismiss." *GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). See 5A C. Wright & A. Miller, *Federal Practice & Procedure* § 1327 (3d Ed. 2004) ("[W]hen the plaintiff fails to introduce a pertinent document as part of her pleading. . .the defendant may introduce the document as an exhibit to a motion attacking the sufficiency of the pleading.").

## LEGAL ARGUMENTS

### I.      The Court is Without Jurisdiction to Hear Claims.

Plaintiff alleges that jurisdiction for his action herein and against defendant Merrick Garland, United States Attorney General, is based on federal question jurisdiction, 28 U.S.C. § 1331.  (Doc. 1, at 8.)  Clark's position was recently rejected in *Horton v. Garland*, No. CIV-22-894-F, 2022 WL 11965920, at *1–2 (W.D. Okla. Oct. 20, 2022), *aff'd*, No. 22-6193, 2023 WL 3161799 (10th Cir. May 1, 2023):

> It is elementary that the United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit. *Merida Delgado v. Gonzales*, 428 F.3d 916, 919 (10th Cir. 2005) (quoting *United States v. Mitchell*, 445 U.S. 535, 538 (1980)).  "In general, federal agencies and federal officials sued in their official capacities are also shielded by sovereign immunity." *Id.* (citation omitted). "A waiver of sovereign immunity cannot be implied but must be unequivocally expressed." *Id.* (quoting *Mitchell*, 445 U.S. at 538). Thus, plaintiff who is bringing a claim against a federal official acting in his official capacity—and therefore, as a matter of law, against the United States—must identify a specific waiver of immunity in order to establish the court's jurisdiction. *See, Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev.*, 554 F.3d 1290, 1295 (10th Cir. 2009). Clark does not provide a waiver of sovereign immunity. *See, Merida Delgado*, 428 F.3d at 919. Consequently, this court's jurisdiction cannot be based on §1331 unless some other statute waives sovereign immunity. *Id.*
>
> Although not cited, the Administrative Procedure Act (APA) "waives the Federal Government's immunity from a suit 'seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomie Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702). This waiver of sovereign immunity is not limited

to suits under the APA. *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1233 (10th Cir. 2005). While plaintiff seeks relief other than damages against defendant, plaintiff does not allege that defendant "acted or failed to act" in an official capacity or under color of legal authority. He does not allege any official misconduct occurred. There are no facts to show any violation of a constitutional right.

While sovereign immunity does not apply when the sovereign consents to suit, such waivers are to be read narrowly. *See, James v. United States*, 970 F.2d 750, 753 (10th Cir. 1992). Even affording the complaint a liberal construction, plaintiff has failed to allege facts to show a waiver of sovereign immunity based on the language of the APA. "(footnote omitted)." Sovereign immunity therefore deprives the court of jurisdiction to entertain plaintiff's claim against defendant. "(footnote omitted)."

Additionally, standing is a jurisdictional prerequisite. *See, Laufer v. Looper*, 22 F.4th 871, 876 (10th Cir. 2022). Plaintiff has the burden of showing standing. *See, Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). To establish standing, plaintiff must allege that he "(1) 'suffered an injury in fact,' (2) that is 'fairly traceable to the challenged action of the defendant,' and (3) that is likely to be 'redressed by a favorable ruling.'" *Laufer*, 22 F.4th at 876 (quoting *Lujan*, 504 U.S. at 560-61). An "injury in fact" is "'an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Lujan*, 504 U.S. at 560).

Like *Horton*, Clark lacks jurisdiction, and the Court should outright deny all of his claims.

## II.   The Gun Control Act is Not Broadly Unconstitutional Under the Second Amendment.

Plaintiff argues the GCA is unconstitutional under the Second Amendment because the Supreme Court and other courts have adopted an incorrect test to determine whether conduct is protected under the Second Amendment. (Doc. 1, at 27, 29, 31, 68.)  In particular, he takes issue with the reasoning regarding dangerous and unusual weapons and what is common use for lawful purposes, arguing that these tests "produce results which are malleable and the protection of the Second Amendment is anything but malleable." (*Id.* at 64.) Indeed, Plaintiff argues the Second Amendment provides a near unqualified right to keep and bear arms.  (*Id.* at 27.) However, courts have repeatedly held otherwise, and no court has found the Second Amendment is absolute or rejected the "dangerous and unusual" exception.

11

The Second Amendment provides that "[a] well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. "Like most rights, the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). Throughout history, "commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* In evaluating what limitations Congress can impose on citizens' Second Amendment rights, the Supreme Court has directed courts to first ask whether "the Second Amendment's plain text covers an individual's conduct." *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2129-30 (2022). If it does, then the Second Amendment "presumptively protects that conduct." *Id.* To overcome that presumption and justify its regulation, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* The Supreme Court has previously concluded that regulations of dangerous and unusual weapons fall outside the scope of the Second Amendment, and *Bruen* did not alter that precedent.[4] *Id.* at 2128.

In *United States v. Miller*, 307 U.S. 174, 178 (1939), the Supreme Court upheld an indictment for transportation of an unregistered short-barreled shotgun in interstate commerce, in violation of the NFA. In doing so, the Court noted an "absence of any evidence tending to show that the possession or use of a [short-barreled shotgun] at this time has some reasonable relationship to the preservation or efficiency of a well-regulated militia," or that such weapon "is any part of the ordinary military equipment or that its use could contribute to the common defense." *Id.* The Court therefore reversed the district court's decision that Section 11 of the NFA, which

---

[4] In his concurrence, Justice Kavanaugh, joined by the Chief Justice, further emphasized that *Bruen* did not abrogate the Court's holding in *Heller*, particularly regarding "dangerous and unusual weapons." *Bruen*, 142 S. Ct. at 2162 (J. Kavanaugh, concurring).

made it unlawful for any person who was required to register their NFA firearm but did not so register to carry the firearm in interstate commerce, violated the Second Amendment. *Id.* at 177; National Firearms Act of 1934, Pub. L. No. 73-474, § 11, 48 Stat. 1239.

In *District of Columbia v. Heller*, 554 U.S. 570, 623 (2008), there was a conflict between the justices about the breadth of the *Miller* holding. The majority, however, held that "*Miller* stands only for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons." *Id.* As to the types of weapons protected, the *Heller* majority expressed specific apprehension that an isolated interpretation of the *Miller* phrase "'part of ordinary military equipment' could mean that only those weapons useful in warfare are protected." *Id.* at 624. It noted that this "would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional, machineguns being useful in warfare in 1939." *Id.* Instead, the *Heller* majority concluded that the Second Amendment protects weapons of the kind "'in common use at the time' for lawful purposes like self-defense," which would have been brought from home by the men called for traditional militia service. *Id.* at 624-25. Therefore, under *Heller*, the Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. *Heller* specifically referenced "weapons that are most useful in military service—M-16 rifles and the like," in contrast to weapons in common use. *Id.* at 627.

*Bruen* did not call into question these holdings from *Heller*. In fact, the majority opinion in *Bruen* recognized and favorably cited *Heller*'s explanation "that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.' 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627 (internal quotation marks omitted)). The Court reaffirmed *Heller*'s conclusion that there is a

"fairly supported . . . historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 2128. But *Bruen*'s focus was narrow: whether "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id.* at 2122. No party disputed "that handguns are weapons 'in common use' today for self-defense." *Id.* at 2134. Therefore, discussion as to whether "the Second Amendment's plain text" covered the conduct at issue was limited, as it was ultimately not contested. *Bruen*, 142 S. Ct. at 2134.

Multiple courts, including those in the Tenth Circuit, have applied *Bruen* and concluded that the Second Amendment does not provide an unqualified right to keep and bear arms. *See*, *e.g.*, *United States v. Trujillo,* No. 1:21-CR-1422-WJ-1, 2023 WL 3114387 (D.N.M. Apr. 26, 2023) (finding the obliteration of a serial number not to be protected conduct under the Second Amendment); *United States v. Carrero,* No. 2:22-CR-00030, 2022 WL 9348792 (D. Utah Oct. 14, 2022) (finding that certain persons, such as felons, may be prohibited from possessing firearms under the *Bruen* standard). Likewise, multiple courts, applying *Bruen*, concluded that the Second Amendment does not extend to dangerous and unusual weapons. *See United States v. Sredl*, No. 3:22-CR-71, 2023 WL 3597715, at *3 (N.D. Ind. May 23, 2023) ("Whatever changes *N.Y. State Rifle v. Bruen* brought to the Second Amendment landscape, inclusion of dangerous and unusual weapons in the Second Amendment right isn't one such change. Possession of dangerous and unusual weapons was excluded from the Second Amendment right before *N.Y. State Rifle v. Bruen*, and their exclusion continues after *N.Y. State Rifle v. Bruen*."); *United States v. Saleem*, -- F. Supp. 3d --, 2023 WL 2334417, at *7 (W.D.N.C. Mar. 2, 2023) (Rejecting the argument that short-barreled shotguns were in common use at the time of the Founding, *"Bruen* did not overturn these holdings; rather, it quoted, explained, re-affirmed, and then applied them."); *United States v.*

*Royce*, No. 1:22-CR-130, 2023 WL 2163677 (D.N.D. Feb. 22, 2023) (finding dangerous and unusual weapons subject to regulation under *Heller* and *Bruen*); *United States v. Simien*, No. SA-22-CR-00379-JKP, 2023 WL 1980487 (W.D. Tex. Feb. 10, 2023) (finding the argument that SBRs and machineguns are protected firearms following *Bruen* to be "foreclosed by binding Fifth Circuit and Supreme Court authority"), *reconsideration denied sub nom. United States v. Marlon Laron Simien*, No. SA-22-CR-00379-JKP, 2023 WL 3082358 (W.D. Tex. Apr. 25, 2023*); United States v. Rush*, No. 22-CR-40008, 2023 WL 403774, at *3 (S.D. Ill. Jan. 25, 2023) (" Far from overruling this part of *Heller*, *Bruen* confirmed that the Second Amendment protects only weapons in common use by law-abiding citizens for self-defense. Thus, regulating the receipt or possession of "dangerous and unusual firearms" like short-barreled rifles does not fall within the Second Amendment.")

### A.   18 U.S.C. 922(t) Does Not Violate the Second Amendment.

18 U.S.C. 922(t) establishes the general rule that when Federal Firearm Licensees (FFLs) seek to transfer firearms to non-licensees (*i.e.*, persons who are not FFLs), FFLs are required to utilize NICS prior to transferring that firearm. *See* 18 U.S.C. 922(t)(1).[5] The establishment of NICS itself is now codified at 34 U.S.C. 40901(b)(1) (formerly 18 U.S.C. 922 Note).

To be sure, 18 U.S.C. 922(t) does not require all firearm transfers to proceed through NICS, just those where an FFL is attempting to transfer a firearm to a non-licensee.  18 U.S.C. 922(t) established a reasonable delay of up through three (3) business days (if necessary) where, if the FFL had not received an affirmative response that the firearm transfer could occur (*i.e.*, "Proceed," see 28 CFR 25.2 defining Proceed"), then the FFL could not transfer the firearm.  This minimal period allows NICS to look for potentially prohibiting information within the National Crime

---

[5] See pages 5-7 above.

Information Center (NCIC), Interstate Identification Index (III) and the NICS Index.  *See* 28 CFR Part 25.4.  If at any point within the three business days potential prohibitions are ruled out, the FBI will convey a "Proceed" response to the FFL – as has occurred repeatedly with Plaintiff – and the transfer may proceed.  Even if after business day three the FFL still does not have a "Proceed" response from the FBI, that transfer is allowed to move forward under federal law so long as the FFL has not first received a "Denied" response from the FBI.  *See* Attachment A, generally, describing the NICS process.

Plaintiff's contention that a background check as a prerequisite to purchasing a firearm violates the Second Amendment is foreclosed by *Bruen*.  Although *Bruen* invalidated New York's "may issue" licensing regime, it approved "shall-issue" regimes that "require applicants to undergo a background check."  142 S. Ct. at 2138 n.9; *see id.* at 2138 ("[N]othing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes."); id. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so.").

For at least two independent reasons, the Supreme Court's approval in *Bruen* of shall-issue licensing regimes compels the conclusion that the background check provisions at issue here are consistent with the Second Amendment.  First, those licensing regimes typically preclude individuals under the age of twenty-one from carrying firearms in public.  Second, the shall-issue licensing regimes of which the *Bruen* Court approved typically provide for a period longer than ten business days (as is allowed for some NICS transactions now but which is not relevant to Plaintiff, see 18 U.S.C. 922(t)(1)(C))—up to ninety days, depending on the State—to complete the applicant's background check.

> "To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes, under which "a general desire for self-defense is sufficient to obtain a [permit]." Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent "law-abiding, responsible citizens" from exercising their Second Amendment right to public carry. Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, "law-abiding, responsible citizens." And they likewise appear to contain only "narrow, objective, and definite standards" guiding licensing officials, rather than requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion," features that typify proper-cause standards like New York's. That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.

*Bruen*, 142 S. Ct. at 2138 (cleaned up).

Given the Supreme Court's approval of State permitting regimes that restrict eighteen- to twenty-year-olds from publicly bearing arms altogether—confirming the Fifth Circuit's holding in *NRA v. ATF* (700 F.3d 185 (5th Cir. 2012) that such restrictions are consistent with historical tradition—it necessarily follows that the Government may impose the lesser constraint of requiring persons to complete a background check before being permitted to purchase a firearm from a federally licensed dealer. Likewise, that delays of up to ninety days before being permitted to carry a firearm for self-defense are constitutionally permissible necessarily requires that reasonable delays of up to ten business days before being permitted to purchase a firearm from a particular source are constitutionally permissible. Accordingly, Plaintiff's claim that background check provisions violate the Second Amendment cannot be squared with the Supreme Court's approval of shall-issue licensing regimes in *Bruen*.

Further, the U.S. District Court for the Northern District of Texas recently concluded that the minimal waiting periods of 18 U.S.C. 922(t), even those potentially extending waiting periods of up through 10 business days for under-21 transactions do not violate the Second Amendment.

"The *Bruen* majority therefore seems to acknowledge the facial constitutionality of regimes requiring background checks and attendant waiting periods to ensure a potential purchaser is not prohibited from exercising Second Amendment rights, so long as the waiting periods are not "lengthy."" *McRorey et al., v. Garland*, No. 7:23-CV-00047-O, 2023 WL 5200670, at *4 (N.D. Tex. Aug. 14, 2023). "The provisions Plaintiffs challenge serve to ensure that FFLs do not transfer firearms to individuals who have juvenile criminal or mental health records that would bar them from possessing a firearm. Such restrictions are presumptively lawful" according to the U.S. Supreme Court. *Id.*

More to the point in this matter of Plaintiff's unsupported claim that 18 U.S.C. 922(t) is generally and/or "as applied" unconstitutional, the court in *McRorey* concluded with the following,

> Finally, Plaintiffs also assert that any waiting period is unconstitutional. Beyond that general assertion, which would apply to those above and below the age of twenty-one, Plaintiffs have not shown that the potential waiting periods here are "indefinite" or that a potential ten-business-day waiting period is unconstitutional in all cases.

The same is true here – Plaintiff has not (and cannot) show that the minimal potential waiting periods that federal law allows under 18 U.S.C. 922(t) are unconstitutional, facially or as applied.

In the landmark *Heller* case, establishing an individual right to keep and bear arms, the Court clearly acknowledged that background checks do not offend the Second Amendment. "Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home." *Heller*, 554 U.S. at 635, 128 S. Ct. at 2822 (emphasis added). This emphasized language of Justice Scalia, particularly when coupled with the language of *Bruen* noted above (142 S.Ct. at 2138, fn. 9), the U.S. Supreme Court has acknowledged for more than a decade even under the individual rights umbrella, there is an inherent, pre-requisite of the Government to take a

reasonable amount of time and determine if a person has been disqualified from exercising Second Amendment rights before transferring them firearms or issuing to them licenses to carry firearms in public. Consequently, 18 U.S.C. 922(t) and its pre-requisite for firearm transfers through federal firearm licensees to be put through a NICS background check, does not offend the U.S. Constitution.

### III.   Plaintiff Lacks Standing as to All of his Claims.

The "irreducible constitutional minimum" of standing requires three elements: Plaintiff must have (1) suffered an injury in fact (2) that is fairly traceable to the challenged conduct of the defendant and (3) that is likely to be redressed by a favorable judicial decision. *Nova Health Sys. v. Gandy,* 416 F.3d 1149 (10th Cir. 2005) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). An injury in fact must show "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 1154. An injury is fairly traceable when it is "not the result of the independent action of some third party not before the court." *Id.* at 1156 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Lastly, a redressable injury means that it cannot be merely speculative that, if a court grants the requested relief, at least some injury will be redressed. *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012).

### A.   Plaintiff's Claims Against the *Brady Act* are Moot or Not Ripe and Plaintiff Therefore Lacks Standing to Bring Those Claims.

Plaintiff brings numerous allegations citing to issues with prior NICS background checks, ranging from checks conducted in 2018 through 2023. Plaintiff claims waiting periods of "over 180 days" (Doc. 1, ¶ 29); such lengthy delays are not possible as regulations require delayed transactions to purge from NICS before day 90. *See* 28 CFR 25.9. *See also*, Doc. 1-2, Attach. A

- Barker Aff., ¶7, infra.  Further – any delay over the third business delay would be due to either the FFL's choice not to transfer a firearm which had not received a "Proceed" response, or any applicable state law extending initial delay of a transfer (which is not believed to exist under Kansas law).   The attached Affidavit of FBI, NICS Section Supervisor Brian Barker clearly demonstrates, since June 15, 2021, and up through April 5, 2023, Plaintiff's NICS transactions have all been proceeded within 24 hours by the NICS Section.  (Attachment A, ¶11, at 3.)

Plaintiff also makes vague, general claims that Defendants will possibly deny him firearms in the future. Plaintiff's claims regarding NICS transactions being delayed are clearly moot (as they have already been proceeded) and/or are not concrete, ripe justiciable cases or controversies.

### B.  Plaintiff Lacks Standing for his Medical Marijuana Claims.

Turning to this first element, two of Plaintiff's claims do not appear to be concrete and imminent injuries in fact. Plaintiff alleges he *intends* to become a user of state-legalized medical marijuana in Plaintiff's home state of Kansas, the state where this action is brought. Even more attenuated, Kansas has yet to enact a statute legalizing medical marijuana use at the state level and may never enact such a statute. "The Supreme Court has instructed that '"some day" intentions . . . do not support a finding of the 'actual or imminent' injury that our cases require.'" *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 874 (10th Cir. 2020) (finding parent's concern that school district might revoke student's existing religious exemption from school vaccination requirements was not an injury in fact that could support Article III standing); *see also Brady Campaign to Prevent Gun Violence v. Brownback*, 110 F. Supp. 3d 1086, 1097 (D. Kan. 2015) ("Where a plaintiff alleges mere 'some day' intentions to engage in certain conduct, without any specification of *when* the some day will be, any future harm that might flow from that conduct is necessarily conjectural or hypothetical rather than imminent.")(internal quotation marks omitted). Plaintiff rests his standing

for challenging 18 U.S.C. § 922(d)(3) upon this yet-to-be-enacted law. Assuming such a law *will be* enacted at some point, future conduct can sometimes be a basis for an injury-in-fact under a pre-enforcement challenge, as Plaintiff appears to argue here. (Doc. 1, at 19.) However, even pre-enforcement challenges require a case to be ripe enough such that a Plaintiff would almost certainly face prosecution if they engaged in the prohibited conduct alleged.[6] *See, e.g.*, *303 Creative LLC v. Elenis*, 6 F.4th 1160 (10th Cir. 2021); *Baker*, 979 F.3d at 875 (rejecting pre-enforcement challenge argument "because 'some day' intentions are insufficient to show the credible and imminent threat necessary for standing"); *Brady Campaign*, 110 F. Supp. 3d at 1097 ("Additionally, courts have considered whether an alleged threat of prosecution target[s] the plaintiff's planned conduct with some degree of specificity. The mere existence of a statute, or even an official's general statement that the government intends to enforce a statutory prohibition against the public, is ordinarily insufficient to establish an imminent threat of prosecution as to a particular plaintiff.") (internal quotation marks omitted).

Here, even if Plaintiff became a user of medical marijuana today, such use would still be unlawful under Kansas law. For Plaintiff's cause of action under § 922(d)(3) to be ripe, Plaintiff must refile if and when Kansas has enacted a medical marijuana law or amend his complaint to challenge § 922(g)(3) without the cover of a medical marijuana statute.

### C.   Plaintiff Lacks Standing for his Serial Number Claims.

Plaintiff also alleges that he intends to restore an unidentified rusty firearm and obliterate its serial number to make it useable. Plaintiff provides no further details about the firearm and does not explain why he would need to obliterate the firearm's serial number to make it useable or how

---

[6] While ripeness and standing are discrete legal principles under subject matter jurisdiction and standing, respectively, in pre-enforcement challenges, standing and ripeness often "boil down to the same question." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 (2007).

he plans to do so. Indeed, Plaintiff's pleadings are so nondescript that defendants cannot ascertain any critical facts that could be influential to or even dispositive of Plaintiff's claim, such as the model of the alleged firearm, the condition of the serial number, or Plaintiff's planned method to restore the firearm. An alleged injury in fact may not be mere "abstract, intellectual problems." *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 20 (1998). Without any further detail or factual averments, Plaintiff's claim here could similarly be characterized as too abstract and speculative to fulfill the constitutional requirements of standing.[7] The Supreme Court has explicitly expressed this principle in discussions on the specificity, concreteness, and particularization of factual allegations.

> [A plaintiff] must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention. Absent the necessary allegations of demonstrable, particularized injury, there can be no confidence of a real need to exercise the power of judicial review . . . .

*Warth v. Seldin*, 422 U.S. 490, 508 (1975) (internal quotation marks omitted). The Supreme Court has also stated that a court may press for more particularized facts when a complaint's facts are underdeveloped, further suggesting that specific factual allegations are critical in a court's standing inquiry.

> [I]t is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed.

*Id.* at 501-02.

### D.  Plaintiff lacks standing for his broad Second Amendment claims.

---

[7] Plaintiff's factual allegations are so nondescript that they may also fail to state a claim under Fed. R. Civ. P. 12(b)(6). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level.").

As for the second and third elements of standing, Plaintiff's broad claim that the Second Amendment provides a virtually unqualified right to keep and bear arms and that courts should adopt his Second Amendment test rather than the Supreme Court's, again does not pass muster. These claims do not seem "fairly traceable" to the Defendant's conduct, and it is unclear whether Plaintiff's claims are justiciable. *See Baker v. Carr*, 369 U.S. 186 (1962) (examining which questions a court may answer, political or otherwise).

### IV. ATF From 4473 does not *compel* self-incrimination and the underlying requirements are lawful.

The Fifth Amendment provides, in relevant part, "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. Am. V.  Courts have held this clause 'privileges [persons] not to answer official questions put to [them] in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate [them] in future criminal proceedings.'" *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)). Courts have also found that the Fifth Amendment right against compelled self-incrimination is a right that generally must be invoked by a person. It is rarely invoked automatically.

> The [Fifth] Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment.

*United States v. Monia,* 317 U.S. 424, 427 (1943) (footnote omitted). For the right to "spring" or be automatic, a defendant must be in a "classic penalty situation" where a person will face significant criminal penalties if they refuse to provide testimonial evidence against themselves or will face similar penalties if they do provide testimonial evidence against themselves.[8] Much like

---

[8] As the Supreme Court has noted, the Fifth Amendment right against self-incrimination is a right to refuse to testify. It is not a right to lie. Accordingly, the Fifth Amendment will not protect one's making of false statements under 18 U.S.C. § 1001. *Brogan v. United States*, 522

a *zugzwang* in a game of chess, a "classic penalty situation" arises when a person has no good legal moves to make, and they are compelled into a worse position. In such circumstances, a person will not need to invoke their Fifth Amendment right. It will have already sprung into effect. *Minnesota v. Murphy*, 465 U.S. 420, 434 (1984) ("The general rule that the [Fifth Amendment] privilege must be claimed when self-incrimination is threatened has also been deemed inapplicable in cases where the assertion of the privilege is penalized so as to 'foreclos[e] a free choice to remain silent, and . . . compe[l] . . . incriminating testimony.'") (Quoting *Garner v. United States*, 424 U.S. 648, 661 (1976)).

Plaintiff's situation here is not a "classic penalty situation." Plaintiff faces no criminal penalties for his refusal to complete Form 4473. Plaintiff would only face criminal penalties if he illicitly acquired a firearm from an FFL without completing Form 4473 or made false statements on Form 4473. Form 4473 is voluntary, not compelled, and Plaintiff only needs to complete it if he wishes to purchase a firearm from an FFL. If Plaintiff wishes to invoke his Fifth Amendment right against self-incrimination on Form 4473, he should simply decline to complete the form.

Plaintiff is also not compelled by the Government to complete Form 4473 to access his Second Amendment rights. Form 4473 does not create any unconstitutional barriers to Plaintiff's possession of a firearm. Indeed, the criminatory questions[9] on Form 4473 relate to firearms requirements that have long been held constitutional. *But see United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023) (18 U.S.C. § 922(g)(8)); *United States v. Harrison*, No. CR-22-00328-PRW, 2023 WL 1771138 (W.D. Okla. Feb. 3, 2023) (§ 922(g)(3)[10]); *United States v. Morales-Lopez*,

---

U.S. 398 (1998).

    [9] It has long been recognized that "[t]he Constitution does not forbid the asking of criminatory questions," *Minnesota v. Murphy*, 465 U.S. 420, 428 (1984) (quoting *United States v. Monia*, 317 U.S 424, 433 (1943)).

    [10] Pending review in the 10th Circuit – *United States v. Harrison*, No. 23-6028.

No. 2:20-CR-00027-JNP, 2022 WL 2355920 (D. Utah June 30, 2022) (§ 922(g)(3)). Plaintiff only has a right to purchase a firearm from an FFL if he does not fall into one of the congressionally determined categories on Form 4473. 18 U.S.C. § 922(g), (n). If Plaintiff does not meet those congressionally determined requirements, he is not eligible to purchase a firearm from an FFL and any false statements he makes on Form 4473 are not protected under the Fifth Amendment.

### V.   18 U.S.C. § 922(g)(3) validly restricts medical marijuana[11] users from purchasing firearms from FFLs in states where medical marijuana is legal.

Setting aside Plaintiff's lack of standing to challenge 18 U.S.C. § 922(g)(3), firearms restrictions on unlawful drug users are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. 2111, 2156 (2022).[12] Two closely related traditions are analogues to § 922(g)(3): (1) the tradition of restricting the firearms rights of those who commit crimes and therefore are not "law-abiding citizens," *id.* at 2156, and (2) the tradition of disarming those whose behavior or status would render their firearms possession a danger to themselves or the community. Possession of illegal drugs, including marijuana, is a federal crime, and federal marijuana law supersedes any state pronouncements on marijuana's legality. U.S. Const. art. 6 ¶ 2 (supremacy clause).

The Supreme Court in *District of Columbia v. Heller* defined the right to bear arms as belonging to "law-abiding, responsible citizens." 554 U.S. 570, 635 (2008). Consistent with that

---

[11] The phrase "medical marijuana" is used herein for convenience, but Congress has found that marijuana "has no currently accepted medical use." 21 U.S.C. § 812(b)(1)(B), Sch. I(c)(10).

[12] Consistent with *Heller* and *Bruen*, this Motion discusses historical sources through the end of the 19th century. *See Heller*, 554 U.S. at 610-19 (discussing 19th century sources); *Bruen*, 142 S. Ct. at 2150-56 (same). "[A]n ongoing scholarly debate" exists on whether historical evidence from the era of the ratification of the Second Amendment in 1791 or the Fourteenth Amendment in 1868 is more probative in delineating the constitutional right to bear arms. *Bruen*, 142 S. Ct. at 2138. This Court need not resolve this debate because, as discussed below, the relevant historical traditions extend through both eras.

definition, the Court explained that "nothing in [its] opinion should be taken to cast doubt" on "longstanding prohibitions on the possession of firearms by felons and the mentally ill," *id*. at 626, which were among a "[non-]exhaustive" list of "presumptively lawful regulatory measures." *Id.* at 627 n.26. *Bruen* likewise repeatedly described the Second Amendment right as belonging to "law-abiding" citizens. 142 S. Ct. at 2122 ("the Second . . . Amendment[] protect[s] the right of an ordinary law-abiding citizen" to possess handguns); *see also id.* at 2131, 2133, 2135 n.8, 2138, 2150, 2156. For that reason, *Bruen* approved the constitutionality of "shall-issue" licensing regimes that "require applicants to undergo a background check or pass a firearms safety course" to ensure that "those bearing arms" are "law-abiding, responsible citizens." *Id.* at 2138 n.9; see id. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible"). *Bruen* does not cast doubt on firearms restrictions that prevent non-law-abiding individuals from obtaining or possessing firearms.

Under *Heller* and *Bruen*, medical marijuana users do not possess a constitutional right to possess firearms. Possession of marijuana is a federal crime, punishable by up to a year in prison on the first offense and by multiple years in prison for subsequent offenses. 21 U.S.C. § 844(a). There is no "medical marijuana" exception to those restrictions. *See Gonzales v. Raich*, 545 U.S. 1, 14 (2005). Sections 922(d)(3) and (g)(3) apply to individuals who not only have committed federal crimes, but are actively engaged in criminal activity at the time they claim the constitutional right to possess firearms: the firearms restrictions in Sections 922(d)(3) and (g)(3) apply to "current user[s]" of drugs whose "unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct." 27 C.F.R. § 478.11. It is therefore plain that persons within Sections 922(d)(3) and (g)(3)'s prohibitions are not "law-abiding" citizens within the scope of the Second Amendment right defined in *Heller* and *Bruen*.

26

In the first decision analyzing the constitutionality of § 922(g)(3) after *Bruen*, a district court upheld the statute and confirmed that many of the earlier decisions had likewise "upheld the constitutionality of § 922(g)(3) under *Heller*'s standards of history and tradition." *United States v. Daniels*, 610 F. Supp. 3d 892, 895 (S.D. Miss. 2022)(citing *United States v. Seay*, 620 F.3d 919 (8th Cir. 2010); *United States v. Dugan*, 657 F.3d 998 (9th Cir. 2011); *United States v. Richard*, 350 F. App'x. 252 (10th Cir. 2009); and *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010)). *Daniels* found particularly persuasive the "robust discussion of the historicity of § 922(g)(3)" in *Yancey*, 621 F.3d 681. *Daniels*, 610 F. Supp. 3d at 896. As *Daniels* described, *Yancey* found § 922(g)(3) analogous to the tradition of "disarmament of felons" and early statutes that "disarmed 'tramps' and 'intoxicated persons,'" and also reasoned that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *Id.* (quoting *Yancey*, 621 F.3d at 684-85). *Daniels* concluded that "the analysis in *Yancey* demonstrates the historical attestation demanded by the *Bruen* framework" because "it suffices to show that analogous statutes which purport to disarm persons considered a risk to society—whether felons or alcoholics—were known to the American legal tradition." *Id.* Courts within the Fourth, Fifth, Seventh, Eighth, and Eleventh Circuits have found likewise. *E.g., United States v. Costianes,* No. CR JKB-21-0458, 2023 WL 3550972 (D. Md. May 18, 2023); *United States v. Le*, No. 423CR00014SHLHCA, 2023 WL 3016297 (S.D. Iowa Apr. 11, 2023); *United States v. Posey*, No. 2:22-CR-83 JD, 2023 WL 1869095 (N.D. Ind. Feb. 9, 2023); ; *United States v. Black*, No. CR 22-133-01, 2023 WL 122920 (W.D. La. Jan. 6, 2023); *United States v. Sanchez,* No. W-21-CR-00213-ADA, 2022 WL 17815116 (W.D. Tex. Dec. 19, 2022); *Fried v. Garland*, No. 4:22-CV-164-AW-MAF, 2022 WL

16731233 (N.D. Fla. Nov. 4, 2022).[13] Importantly, however, some courts within the Tenth Circuit have disagreed. *United States v. Harrison*, No. CR-22-00328-PRW, 2023 WL 1771138 (W.D. Okla. Feb. 3, 2023) (finding § 922(g)(3) unconstitutional in light of *Bruen*); *United States v. Morales-Lopez*, No. 2:20-CR-00027-JNP, 2022 WL 2355920 (D. Utah June 30, 2022) (finding § 922(g)(3) void for vagueness).[14] In adjudicating § 922(g)(3)'s constitutionality here, this Court should also consider the Tenth Circuit's repeated, earlier upholding of other similar portions of § 922(g). *See United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012) (§ 922(g)(5)); *United States v. Reese*, 627 F.3d 792, 800 (10th Cir. 2010) (§ 922(g)(8)); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009) (§ 922(g)(1)); *In re United States*, 578 F.3d 1195, 1200 (10th Cir. 2009) (unpublished) (§ 922(g)(9)); *United States v. Richard*, 350 F. App'x. 252, 260-61 (10th Cir. 2009) (unpublished) (§ 922(g)(3)). Though these favorable § 922(g) cases in the Tenth Circuit predate *Bruen*, there is still sufficiently persuasive case law across the circuits that would permit a court in this district to find § 922(g)(3) constitutional.

As several circuits have recognized, "many scholars agreed that 'the right to bear arms was tied to the concept of a virtuous citizenry[;] . . . accordingly, the government could disarm 'unvirtuous citizens.'" *Folajtar v. Att'y Gen. of the U.S.*, 980 F.3d 897, 902 (3d Cir. 2020) (quoting *Binderup v. Att'y Gen. of the U.S.*, 836 F.3d 336, 348 (3d Cir. 2016) (en banc)); *accord Yancey*, 621 F.3d at 684-85 (7th Cir. 2010); *United States v. Vongxay,* 594 F.3d 1111, 1118 (9th

---

[13] *Fried*, in particular, addressed § 922(g)(3) and medical marijuana use in light of *Bruen*. The court found the historical regulations listed in this section analogous to § 922(g)(3) and held it constitutional.  But see, *United States v. Daniels*, ___ F.4th ___, 2023 WL 5091317 (5th Cir. Aug. 9, 2023)(finding 922(g)(3) unconstitutional as applied).

[14] Defendants believe *Morales-Lopez* can be distinguished from the present case, while not conceding standing, plaintiff claims he "presently intends to become a user of marijuana." (Doc.1, at 3). Plaintiff's concession should allay any concerns regarding the vagueness purportedly surrounding the term "user."

Cir. 2010). "One implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming . . . criminals." Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1360 (2009). Second, a historical tradition exists of regulations that restrict or prohibit firearms possession by those whose possession of firearms the government deems dangerous. A 1662 English law allowed lieutenants to disarm "any person or persons" judged "*dangerous to the Peace of the Kingdome*." 13 & 14 Car. 2, ch. 3, § XIII (1662) (emphasis added). Likewise, in America, the Pennsylvania antifederalists' influential proposal would have allowed disarmament for "real danger of public injury." *Skoien*, 614 F.3d at 640.

In England and in America from the colonial era through the 19th century, governments regularly disarmed a variety of groups deemed dangerous. England disarmed Catholics in the 17th and 18th centuries. *See Heller*, 554 U.S. at 582 (citing 1 W. & M., ch. 15, § IV, in 3 Eng. Stat. at Large 422 (1689); William Blackstone, 4 Commentaries on the Laws of England 55 (1769)). Many American colonies forbade providing Indians with firearms. "During the American Revolution, several states passed laws providing for the confiscation of weapons owned by persons refusing to swear an oath of allegiance to the state or the United States." Saul Cornell & Nathan DeDino, *A Well-Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 n.128 (2004) (citing Act of Mar. 14, 1776, ch. VII, 1775-1776 Mass. Acts 31; Act for the Further Security of the Government, ch. LXI, § 5, 1777-1778 Pa. Laws 123, 126). States also have disarmed the mentally ill and panhandlers.

Perhaps most relevant here, a long tradition exists of viewing intoxication as a condition that renders firearms possession dangerous and accordingly restricting the firearms rights of those who become intoxicated. In 1655, Virginia prohibited "shoot[ing] any gunns at drinkeing." Act

XII of March 10, 1655, 1655 Va. Laws 401, 401-02. In 1771, New York prohibited firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages ... frequently done on [those days] by persons . . . being often intoxicated with Liquor.'" *Heller*, 554 U.S. at 632 (quoting Ch. 1501, 5 Colonial Laws of New York 244-46 (1894)).

In the era following ratification of the Fourteenth Amendment in 1868, which extended the Second Amendment to the states, *see McDonald v. City of Chicago*, 561 U.S. 742 (2010), many states enacted statutes prohibiting intoxicated persons from possessing, using, or receiving firearms. *See* Kansas Gen. Stat., Crimes & Punishments, § 282 (1868) ("any person under the influence of intoxicating drink" may not "carr[y] on his person a pistol . . . or other dangerous weapon"); 1878 Miss. Laws 175-76 § 2 (making it unlawful to sell pistols and certain knives to a "person intoxicated"); 1883 Mo. Laws 76, § 1 (prohibiting carrying a dangerous weapon "when intoxicated"); 1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals, ch. 329 § 3 ("It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver."); 1890 Okla. Sess. Laws 495, art. 47, § 4 (officers may not "carry[] . . . arms while under the influence of intoxicating drinks"); 1899 S.C. Acts 97, No. 67, § 1 (forbidding "boisterous conduct" while "under the influence of intoxicating liquors," including "discharg[ing] any gun" near a public road); *see also State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886) (upholding Missouri statute as "a reasonable regulation of the use of such arms"). The historical tradition embodied by these laws continues today, with a majority of states "restrict[ing] the right of habitual drug abusers or alcoholics to possess or carry firearms." *Yancey*, 621 F.3d at 684 (collecting statutes).

Plaintiff argues there is no historical tradition of denying individuals their Second Amendment rights based on the use of marijuana, but Plaintiff misconceives of the nature of *Bruen*'s historical test. Under *Bruen*, a "historical *analogue*" is sufficient to sustain a firearms

regulation; a "historical twin" is not required. 142 S. Ct. at 2133. Therefore, a lack of early laws specifically targeting marijuana does not imply that today's laws are unconstitutional as applied to marijuana. Rather, courts must "engag[e] in an analogical inquiry" comparing a modern law to historical tradition, with "two metrics" being "central" in this inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* Both metrics demonstrate the constitutionality of the challenged restrictions given the structure and mission of the above historical firearms laws. *See Fried v. Garland*, No. 4:22-CV-164-AW-MAF, 2022 WL 16731233 (N.D. Fla. Nov. 4, 2022).

### VI.   18 U.S.C. § 922(k) validly restricts persons from obliterating or altering firearm serial numbers.

At least seven district courts have held 18 U.S.C. § 922(k) is constitutional under *Bruen*. *See United States v. Trujillo*, No. 1:21-CR-1422-WJ-1, 2023 WL 3114387 (D.N.M. Apr. 26, 2023); *United States v. Bradley*, No. 2:22-cr-98, 2023 WL 2621352 (S.D.W. Va. March 23, 2023); *United States v. Lovo-Serrano*, No. 5:21-cr-398-FL-1, 2023 WL 1863164 (E.D.N.C. Feb. 9, 2023); *United States v. Serrano*,—— F.Supp.3d ——, 2023 WL 2297447 (S.D. Cal. Jan. 17, 2023); *United States v. Tita*, No. RDB-21-334, 2022 WL 17850250 (D. Md. Dec. 22, 2022); *United States v. Reyna*, No. 3:21-cr-41, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022); and *United States v. Holton*,—— F.Supp.3d ——, 2022 WL 16701935 (N.D. Tex. Nov. 3, 2022). Only one district court, and the sole case Plaintiff cites to support his claim, has found otherwise. *United States v. Price*, No. 2:22-CR-00097, 2022 WL 6968457 (S.D.W. Va. Oct. 12, 2022). The court in *Price* was the first to examine § 922(k) in light of *Bruen*. However, district courts to examine § 922(k)'s constitutionality since *Price* have declined to follow *Price*, including other courts in the Fourth Circuit where *Price* originated.

In *Trujillo*, a court in the Tenth Circuit found American historical traditions of firearm regulation to be analogous enough to contemporaneous firearms regulations on serial numbers to hold § 922(k) constitutional.

> The United States points to a variety of firearms regulations enacted during the colonial period before and after the Revolutionary War that similarly regulated the sale, transfer, and manufacturing of firearms and facilitated firearms tracing. "[C]olonial governments substantially controlled the firearms trade. The government provided and stored guns, controlled the conditions of trade, and financially supported private firearms manufacturers." Relevant regulations that facilitated firearm tracing include: "A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions." Also relevant are early colonial firearm registration and muster requirements. Moreover, several colonial regulations were adopted to prevent individuals from possessing firearms who, at that time in history, were considered potentially dangerous. Finally, in the 18th and 19th centuries, several states imposed regulations on firearms manufacturing.

*Trujillo*, No. 1:21-CR-1422-WJ-1, 2023 WL 3114387 at 5 (internal citations and explanatory parentheticals omitted). As noted above, § 922(k) need not be a "historical twin" to historical traditions of firearm regulation. 142 S. Ct. at 2133. Instead, these historical traditions merely need to be *analogous* with the method and purpose of the contemporary regulations. *Id.* ("two metrics" being "central" in this inquiry: "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." (emphasis added)). The court noted these historical regulations and § 922(k), "while effected by different means, address similar goals: (1) controlling and tracing the sale of firearms and (2) ensuring dangerous individuals did not obtain firearms." 2023 WL 3114387 at 5 (quoting, *Holton*, No. 3:21-CR-0482-B, 2022 WL 16701935 at 3).

The *Trujillo* court also noted the historical regulations outlined above and § 922(k) place comparable burdens on the right to possession of a firearm for self-defense. Serial number and registration requirements do "not impair the use or functioning of a weapon in any way" and thus

"impose little to no burden on individual's right to bear arms." *Id.* (quoting, *United States v. Marzzarella*, 614 F.3d 85, 94 (3d Cir. 2010)).

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court dismiss the complaint in its entirety without prejudice for lack of subject matter jurisdiction, or in the alternative, with prejudice for failure to state a plausible claim.

Respectfully submitted,

KATE E. BRUBACHER
United States Attorney
District of Kansas

*s/ Terra D. Morehead*
Terra D. Morehead #12759
Assistant United States Attorney
Ks.S.Ct. No. 12759
500 State Ave., Suite 360
Kansas City, KS 66101
Tele: 913.551.6730
Fax: 913.551.6541
E-mail: terra.morehead@usdoj.gov

*s/ Brian E. Vanorsby*
Brian E. Vanorsby, KS #27606
Assistant United States Attorney
United States Attorney's Office
District of Kansas
1200 Epic Center, 301 N. Main
Wichita, Kansas 67202
Office: 316.269.6481
Fax: 316.269.6484
E-mail: brian.vanorsby@usdoj.gov
Attorneys for the Defendant United States

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 21, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. which will send a notice of electronic filing to the following CM/ECF participant:

Eric S. Clark
1430 Dane Avenue
Williamsburg, Kansas  66095
Pro-se Plaintiff

*s/ Terra D. Morehead*
Terra D. Morehead
Assistant United States Attorney
